**REDACTED**

**No. 25-4598**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

## UNITED STATES OF AMERICA,

Plaintiff – Appellant,

**v.**

## NICHOLAS JOHN ROSKE,

Defendant – Appellee.

On Appeal from the United States District Court
for the District of Maryland, Southern Division,
The Honorable Deborah L. Boardman, District Judge.

## APPELLANT'S OPENING BRIEF

John A. Eisenberg
Assistant Attorney General

Jeffrey M. Smith
Acting Chief, Appellate Section
National Security Division

A. Tysen Duva
Assistant Attorney General

Josh A. Goldfoot
Deputy Assistant Attorney General

Robert A. Parker
Chief, Appellate Section
Criminal Division

Kelly O. Hayes
United States Attorney

David C. Bornstein
Assistant United States Attorney
Chief, Appellate Division
United States Attorney's Office
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 290-4800

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

JURISDICTIONAL STATEMENT ................................................................1

ISSUE PRESENTED ......................................................................................2

INTRODUCTION ..........................................................................................3

STATEMENT OF THE CASE .......................................................................7

    A.    Roske Has Long Gravitated Towards Violence ...................................7

    B.    Roske's Plan to Assassinate Justice Kavanaugh ..................................9

    C.    Roske's Arrest at Justice Kavanaugh's Home ...................................15

    D.    Indictment and Plea .........................................................................18

    E.    Sentencing ........................................................................................20

SUMMARY OF ARGUMENT ....................................................................25

STANDARD OF REVIEW ..........................................................................28

ARGUMENT ...............................................................................................28

    A.    The District Court's Variance Demanded a Sufficiently
        Compelling Justification. ..................................................................28

    B.    The District Court Impermissibly Relied on Roske's Medical
        Condition to Justify its Exceedingly Light Sentence. ........................30

    C.    The District Court Erroneously Deemphasized Other, More
        Relevant Sentencing Factors. ............................................................39

        1.    Roske's Sentence Fails to Account for the Seriousness of
            his Offense or the Need to Provide Just Punishment ...............40

2. Roske's Sentence Undermines Respect for the Law and Fails to Provide General Deterrence. ..........................................46

3. Roske's Sentence Fails to Afford Specific Deterrence or Protect the Public from Further Crimes. ...................................50

4. The District Court Wrongly Disregarded the Terrorism Enhancement. ...........................................................................53

D. This Case Should Be Reassigned ........................................................57

CONCLUSION ................................................................................................59

CERTIFICATE OF COMPLIANCE .................................................................60

CERTIFICATE OF SERVICE .........................................................................60

# TABLE OF AUTHORITIES

**Cases**

*Dobbs v. Jackson Women's Health Organization*,
  597 U.S. 215 (2022) ............................................................................3

*Doe v. Blanche*,
  172 F.4th 901 (D.C. Cir. 2026) ................................................... 44-45

*Gall v. United States*,
  552 U.S. 38 (2007) ................................................................ 26, 28-29

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
  725 F.3d 940 (9th Cir. 2013) ..............................................................58

*Peugh v. United States*,
  569 U.S. 530 (2013) ............................................................................29

*Roe v. Wade*,
  410 U.S. 113 (1973) ..............................................................................9

*United States v. Abu Ali*,
  528 F.3d 210 (4th Cir. 2008) ....................................... 28-29, 40-41

*United States v. Arroyo*,
  75 F.4th 705 (7th Cir. 2023) ..............................................................49

*United States v. Benkahla*,
  530 F.3d 300 (4th Cir. 2008) ................................................... 54, 57

*United States v. Bistline*,
  665 F.3d 758 (6th Cir. 2012) ................................................... 55, 57

*United States v. Bolton*,
  858 F.3d 905 (4th Cir. 2017) ............................................................39

*United States v. Cannady*,
  63 F.4th 259 (4th Cir. 2023) ..............................................................29

*United States v. Christman,*
607 F.3d 1110 (6th Cir. 2010) ........................................................39

*United States v. Daoud,*
980 F.3d 581 (7th Cir. 2020)..........................................................41

*United States v. Fitzpatrick,*
126 F.4th 348 (4th Cir. 2025) ...........................28, 30-31, 33-37, 45, 53

*United States v. Hasson,*
26 F.4th 610 (4th Cir. 2022) ..........................................................53

*United States v. Herrera-Zuniga,*
571 F.3d 568 (6th Cir. 2009)..........................................................54

*United States v. Howard,*
28 F.4th 180 (11th Cir. 2022) .........................................................51

*United States v. Jayyousi,*
657 F.3d 1085 (11th Cir. 2011) ......................................................56

*United States v. Johnson,*
529 U.S. 53 (2000).........................................................................52

*United States v. Le,*
902 F.3d 104 (2d Cir. 2018).............................................................55

*United States v. Maddox,*
48 F.3d 791 (4th Cir. 1995) ............................................................45

*United States v. McCall,*
934 F.3d 380 (4th Cir. 2019)...........................................................58

*United States v. Meskini,*
319 F.3d 88 (2d Cir. 2003)........................................................ 54, 56

*United States v. Ressam,*
679 F.3d 1069 (9th Cir. 2012) (en banc) ............................... 40, 53, 56

iv

*United States v. Schrank*,
  975 F.3d 534 (6th Cir. 2020)................................................................40

*United States v. Slinkard*,
  61 F.4th 1290 (10th Cir. 2023) ............................................................57

*United States v. Stewart*,
  590 F.3d 93 (2d Cir. 2009)............................................................. 56-57

*United States v. Thompson*,
  130 F.4th 1158 (9th Cir. 2025) ............................................................32

*United States v. Zuk*,
  874 F.3d 398 (4th Cir. 2017)......................... 28, 30-37, 39, 48, 50, 57

**Statutes and Sentencing Guidelines**

18 U.S.C. § 351 .......................................................................18-19, 49-50

18 U.S.C. § 2332b ....................................................... 19, 49, 54-55

18 U.S.C. § 3231 ......................................................................................1

18 U.S.C. § 3553 .................................5, 20-21, 23-24, 27-28, 30, 40, 47-50

18 U.S.C. § 3742 ......................................................................................1

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-
  132, 110 Stat. 1214 ......................................................... 53

U.S.S.G. § 3A1.4.......................................................... 19, 24, 55

U.S.S.G. § 3E1.1 ..................................................................................19

U.S.S.G. § 5K2.16..................................................................................25

**Other Authorities**

BOP Program Statement 5260.01 ..........................................................45

Exec. Order No. 14168, 90 Fed. Reg. 8615 (2025)................................44

Gary Grumbach & Kyla Guilfoil, *Supreme Court Justice Amy Coney Barrett's Home Targeted in Apparent 'Swatting' Incident*, NBC NEWS (May 28, 2026).............................................................................47

H.R. Rep. No. 104-383 (1995).....................................................................53

John G. Roberts, Jr., Year End Report on the Federal Judiciary (2024) .................47

Robert J. Conrad, Jr., *Director's Message*, Admin. Off.: Annual Report (2025) .............................................................................................47

U.S. Sent. Comm'n, Annual Report (2025)..............................................40

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over defendant-appellee Nicholas Roske's offense under 18 U.S.C. § 3231. It entered judgment of conviction on October 6, 2025. JA225-231. The government filed a notice of appeal on October 31, 2025. JA538. This Court has jurisdiction under 18 U.S.C. § 3742(b).[1]

---

[1] For most of this case and in much of the underlying factual record, Nicholas Roske identified as male, went by his birth name, and used male pronouns. During the PSR investigation in 2025, Roske revealed for the first time in these proceedings that he identified as transgender and preferred to be called "Sophie." JA652, ¶ 48. Because Roske has not sought to legally change his name or alter the case caption, the government refers to Roske by the male name and pronouns associated with the judgment of conviction, unless otherwise indicated by the record.

1

## ISSUE PRESENTED

Whether a 97-month prison sentence for Roske's attempted assassination of a Justice of the United States Supreme Court—a 73% downward variance from the bottom of his agreed-upon Guidelines range—is substantively unreasonable.

## INTRODUCTION

At 1:00 a.m. on June 8, 2022, Nicholas Roske stood outside the home of Supreme Court Justice Brett M. Kavanaugh. He had flown across the country that night with a bag containing a gun, a knife, loaded magazines, ammunition, duct tape, zip ties, a lock-pick set, pepper spray, tactical gloves, non-slip socks that fit over the treads of his shoes, a crowbar, a thermal-imaging monocular, and more. His intent was to assassinate Justice Kavanaugh in order to prevent issuance of the Supreme Court's opinion in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), a draft of which had leaked to the press a few weeks earlier, and to alter the Supreme Court's ideological direction "for decades to come." JA733.

Roske had meticulously planned the assassination for weeks. He pieced together publicly available information to figure out Justice Kavanaugh's home address—and, for good measure, tracked down the home addresses of three other Justices who had reportedly joined the draft *Dobbs* opinion, telling a friend that in plotting to "remove some people from the supreme court," he was "shooting for 3." JA733. Roske researched extensively how to break into Justice Kavanaugh's house and prepared a plan of attack for once he was inside. The zip ties, for instance, were to "restrain" whomever else was there, Roske later told police—presumably, the Justice's family. JA604; *see* JA749. Roske exhaustively researched how to

3

commit murder and make it as gruesome as possible. Roske's internet history was littered with searches asking questions like whether "twisting or dragging a knife cause[s] more damage," and websites that contained photographs of blades plunged into victims' necks. JA368-369, JA747-749, JA756-767.

Roske's plot unraveled at the last minute—only after he made it yards away from the Justice's front door with his assassination kit in tow. When Roske got out of his taxi, he spotted Justice Kavanaugh's security detail outside the front of the house, which prompted him to walk to an adjoining street instead. Had the coast been "clear," Roske later said, he intended to "[b]reak in" and "shoot him." JA584. While figuring out his next steps, Roske received a call from his sister—who, over a twenty-minute conversation, "convince[d]" Roske to abandon his plot. JA563-564, JA700-701. Only then did Roske call 911 out of a desire to "avoid a violent encounter" with law enforcement. JA581; *see also* JA326 n.8, JA701. When the police arrived, Roske surrendered, confessed, and eventually pleaded guilty to the attempted assassination of a Supreme Court Justice.

Ordinarily, would-be murderers—not to mention would-be assassins set on killing a senior government official for terroristic purposes—receive lengthy prison sentences. Roske's Sentencing Guidelines range was 360 months to life. JA8-10. Yet the district court determined that "just punishment" for this assassination attempt

4

against a sitting Supreme Court Justice for the avowed purpose of flipping the result of a pending case and the Court's ideological composition should "not" include a "particularly long" prison term. JA144. Based on Roske's mental health challenges, family connections, and alleged remorse, the court sentenced Roske to about eight years in prison (97 months)—22 years below the bottom of the applicable Guidelines range. JA176-177.

That sentence is unreasonable. As this Court has repeatedly held in vacating similar downward variances, a defendant's medical condition does not shield him from culpability if he retains agency and appreciates the consequences of his actions. Here, far from being unable to appreciate the consequences, Roske by his own admission assiduously plotted Justice Kavanaugh's murder precisely *because of* its consequences: To stop *Dobbs* from issuing and to change the ideological makeup of the Supreme Court. JA732-733. Nothing about Roske's history of depression, gender dysphoria, or other health issues caused him to meticulously plot and nearly execute an assassination.

The district court also wrongly placed excessive weight on Roske's personal history at the expense of far more probative sentencing factors under 18 U.S.C. § 3553(a), including the need to ensure just punishment, further respect for the rule of law, promote public safety, and deter the defendant and others from committing

5

such heinous acts in the future. Despite acknowledging the seriousness of Roske's crime and the harms it caused to Justice Kavanaugh, the Kavanaugh family, and the rule of law itself, the court placed more emphasis on how "heartened" it was "by how this terrible offense has drawn the Roske family closer and has helped them understand Ms. Roske's profound mental health struggles and accept her for who she is." JA129. It adopted a highly sanitized account of Roske's offense, identifying its defining moment as Roske's "truly remarkable" and "extraordinary" decision to call the police. JA139-140. It discounted the need for deterrence and just punishment, opining that Roske "does not need [a] particularly long [sentence] to sufficiently punish her," JA144, and that no "rational actor" would try to kill a judge if he faced "a sentence roughly in the area of 10 years," JA152. At a time of escalating threats of violence against public officials, sentencing a would-be assassin to less time than the average robber signals unacceptable sympathy for those who seek to resolve political or legal disagreements through violence.

This Court should vacate Roske's unreasonably lenient sentence and reassign the case for resentencing. The district court based its sentence on a two-hour recitation of firmly held beliefs about a number of fundamental points, and it is unlikely the court could put those established views out of mind. The interests of

justice and the unusual circumstances of this case warrant reassignment to a new judge who can take a fresh look on remand in light of this Court's guidance.

## STATEMENT OF THE CASE

### A. Roske Has Long Gravitated Towards Violence

Roske is now 30 years old. *See* JA967. As Roske has acknowledged, he had a "happy" childhood in California as part of a "close-knit" family. JA789. He was an Eagle Scout; counselor for his church's bible school; and "excelled" in school "[f]rom a young age." JA790-791. Yet beginning in high school, Roske struggled with periods of "persistent depression"; at his lowest points, Roske considered suicide. JA792-793, JA802. By finding support in friends and family, Roske was largely able to "ke[ep] up with school and work" through these "difficult time[s]." JA796 (boldface omitted); *see* JA800-801. Indeed, Roske graduated from college with honors in 2018 and eventually became a substitute teacher. JA792, JA800, JA873, JA979.

Over the years, however, Roske grew increasingly fixated on harming others. Some of his violent ideations were born out of a feeling of boredom. In April 2015, Roske—a 19-year-old college freshman—told a medical professional he was "bored with life" and had considered killing his sister "by stabbing her in the throat with a knife" in the hope it might "bring some interest." JA977, ¶ 59. More often, Roske

7

was drawn to murder as a means of social change.   In college, Roske developed a brand of "utilitarian" philosophy where "killing another person" would be "moral" if it "prevent[ed] a worse evil."   JA865 & n.3.

Starting in late 2020, Roske also "began to identify as a woman."   JA849, JA856.   ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████   Roske ██ ████████████████████████████   and started to go by "Sophie."   JA858; JA955 n.9.   After ████████████████ , Roske moved out of his parents' home to live on his own in Seattle, Washington.   JA858.

During this period, Roske continued gravitating towards violence.   In April 2021, Roske branded himself a "vigilante," said he was "seriously considering" "killing a serial rapist," and admitted to thinking about murdering those "who ha[d] wronged" him.   JA860, JA862, JA977, ¶ 61.   He later told police that around this time, he also considered killing a pedophile, which would be "good" and give him a "sense of purpose."   JA584.   In May 2021, Roske told a medical professional that he was thinking about killing a "bad" person for "utilitarian" reasons and "using a knife" to do so.   JA862.

In late May 2021, Roske moved back home to California to live with his parents. JA863. As his depression persisted, Roske stopped ████████████ and living outwardly as "Sophie" because he believed his parents would not understand. JA800, JA955 n.9. In early 2022, Roske began to work as a substitute teacher. JA979, ¶ 67.

By March 2022, Roske's desire to commit a socially consequential murder reached an apex. He discussed his "violent thoughts" with others online and argued that "bad" people "deserve" to be killed. JA731. He repeatedly searched the internet for "sex offenders near [him]," as well as local rape and crime statistics. JA739. In April 2022, he posted on Reddit, "Which person's death would have the biggest impact on the world?" JA372. He also regularly searched for videos of shootings—including school shootings—and the best places to obtain a handgun or rifle. JA739-740.

### B. Roske's Plan to Assassinate Justice Kavanaugh

In May 2022, a draft of the Supreme Court's *Dobbs* opinion leaked to the press. According to reports, the Court was planning to overturn *Roe v. Wade*, 410 U.S. 113 (1973), with Justice Kavanaugh as one of the necessary five votes.

The news of *Dobbs* arose just as Roske was scouring the internet for ideas for putting his violent utilitarian philosophy into action. *See* JA740. "[F]urious"

about the political and policy consequences of *Dobbs*, JA730, Roske considered it "obvious" that "preventing the finalization of the decision to overturn *Roe* was the right thing to do," JA865. He decided to "make the world a better place" by murdering Justice Kavanaugh. JA580, JA610.

By his own admission, Roske's decision to murder a Supreme Court Justice was calculated and political. By killing Justice Kavanaugh, Roske sought to rob *Dobbs* of its majority and allow then-President Biden to fill Justice Kavanaugh's seat on the Supreme Court with "someone who wouldn't repeal" *Roe*. JA732. More broadly, Roske believed that the current Court had a "5-4 majority" favoring conservatives, such that if he killed "one conservative justice," it would flip the ideological balance of the Court. JA732-733. That change, Roske believed, would advance his other goals, including protecting "gay marriage" and supporting "gun restrictions." JA600, JA730, JA732. Roske's intent was to "change the votes" on the Court "for decades to come." JA733.

While Roske fixated on killing Justice Kavanaugh, he considered going even further. "I am shooting for 3 [Justices]," Roske told a friend. JA733. When those he was messaging with online pushed back on Roske's plan—for instance, saying that murdering a Justice would simply help "reelect" Republicans—Roske held firm: Regardless of what happens later at the ballot box, he insisted, "at the end of the day

[B]iden still chooses the replacements" for the Court, and Republicans could not "do shit about it."  JA733; *see* JA633.  A friend told Roske that he was mistakenly looking to "shoot someone you hate" "thinking it will mean something."  JA734. Roske responded that he did not "care" what anyone thought about his plan because killing Justice Kavanaugh would mean that a "conservative" Justice would be replaced by a "liberal."  JA733-734.

Roske labored to turn his words into action, meticulously planning Justice Kavanaugh's assassination over the span of five weeks.  Roske spent a significant amount of time figuring out where the Kavanaugh family lived, including by conducting extensive online research and matching results to a newspaper photo. JA473, JA625-626; JA995 at 9:22-10:09.  Roske also tracked down the home addresses of three other Justices who had reportedly joined the draft *Dobbs* opinion: ███████████████████████████████████████████.  *See* JA745, JA749.  He then created and saved a map on his phone that noted where each Justice lived.  JA752-753.

Roske also extensively researched how to break into Justice Kavanaugh's home.  Roske looked up the "skills" and "equipment" of an "assassin" or "spy"— including the "easiest way to open a locked door," "how to break glass quietly," the "most reliable way to pick locks," the "best way to break into a house," "how to

make shoes quieter," "how long does it take for cops to respond to shots fired," and "fastest way to improve running speed."   JA741, JA743-747, JA749-750.

Roske fixated on how he would kill the Justice.   Across multiple days, Roske looked up the "most effective place to stab someone," the "best length of knife for stabbing," "how to hold a combat knife," "how far into the neck is the trachea," "garrote," and "how much force do you need to stab someone's neck."   JA741, JA747-749.   He researched whether "twisting or dragging a knife cause[s] more damage," and which stab wounds "cause[] the most bleeding."   JA749.   He visited dozens of websites showing knife wounds, including a series of gruesome photos of knives lodged in people's necks.   JA368-369, JA756-767.   Roske also searched "how to make handcuffs with zip ties" (which he bought) as part of his plan to "restrain" anyone else in the house if necessary—presumably the Justice's family. JA604, JA749, JA769; JA970, ¶ 18(g).

Roske also bought a handgun and planned to shoot Justice Kavanaugh as an alternative.   He researched firearms-related terms over 90 times in the span of a few weeks—looking into which guns were "quiet" or "quietest" and how to buy or make a "silencer."   *See* JA740-750.   Roske ultimately settled on a Glock 17 pistol. When he tried to buy one at a gun store, Roske was told that he needed to wait 10 days to pick it up under California's mandatory waiting period—specifically, until

June 2, 2022, at 4:40 p.m. JA681-682. Roske returned to the store at 4:43 p.m. on June 2. JA712. The next day, he practiced firing the gun at a shooting range. JA718-724.

Roske also investigated at length how to get away with the murder. Roske posted a question to an online forum about the "methods" that "a killer who is obsessed with not leaving evidence" might use. JA372. He looked into whether his "car" and "phones" had GPS trackers on them and "how to switch license plates from one car to another." JA744. He searched which countries "don't extradite" or are "least likely to extradite" to the United States, including whether Iceland and Sweden extradite—and also, in keeping with his political motives, what their "abortion laws" were. JA744-745. Roske even researched what might happen if he was caught—including a possible "insanity defense" and "how to stay sane in solitary confinement." JA748-749. Meanwhile, Roske kept close tabs on "when will the roe v wade decision be made." JA745; *see* JA749-750.

Halfway through his preparation, on May 15, 2022, Roske tried to schedule a virtual therapy session because he was "having violent thoughts, ███████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████ ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████ When the therapist had trouble logging into their session, Roske said he might reschedule but never did.   JA904-905.

Afterwards, Roske bought everything he needed for the assassination over the course of at least ten separate purchases.   This included the Glock 17 handgun, a rail mounted tactical light with laser sight, duct tape, zip ties, pepper spray, ammunition, non-slip socks that fit over the treads of his shoes, a lockbox to take his gun onto a plane, a pry bar, and a lock-pick set, among other things.   *See* JA350, JA640-643, JA671, JA681-684, JA725, JA750, JA769.

Finally, in early June 2022—with his preparations nearly complete—Roske looked up "how to wipe down a drive" and proceeded to data-wipe his computer. JA630, JA750.   Roske also deleted the Discord social media account where he had communicated with his friends about killing Justice Kavanaugh.   JA613, JA698.

### C. Roske's Arrest at Justice Kavanaugh's Home

On June 4, 2022, Roske booked a flight from Los Angeles to Washington, D.C., for June 6. JA520-521. In preparation, Roske googled whether "pepper spray [will] explode on an airplane," whether "you [can] have a knife in a checked bag," and whether "you have to declare a pistol in checked baggage." JA750. Roske then packed his bag, which included his gun, knife, pepper spray, zip ties, and the many other items he had purchased to carry out the murder. *See* JA970, ¶ 18.

On June 6, Roske arrived at the airport "too late" to check his bag, and thus too late to fly across the country with a gun. JA577; *see also* JA364, JA521, JA704. He rebooked his flight for the next day, JA520-521, JA577, JA699, and arrived at the airport three hours early, *see* JA365, JA521, JA706.

Roske arrived in Washington, D.C., around midnight on June 8. *See* JA521. He got into an airport taxi and directed it to Justice Kavanaugh's home in Maryland. *See* JA670. During the drive, Roske texted his sister, "I love you." JA325, JA579, JA700. Roske arrived at 1:06 a.m. JA670.

Standing outside Justice Kavanaugh's home, with his assassination kit in hand, Roske "noticed immediately that there were people sitting outside." JA579. Roske had previously researched whether "the secret service protect[s] supreme court justices," JA743, and later confessed that if "everything was clear" he intended

15

to "[b]reak in" and "shoot" Justice Kavanaugh, JA584.   Instead, he encountered two Deputy U.S. Marshals parked in front of the Justice's home "in unmarked white SUVs, facing each other."   JA375, ¶ 3.   As Roske later acknowledged, he "would have been stopped" by the Marshals if he had tried to get into the house, JA960-961, so he nonchalantly walked down the sidewalk and went "around the house on the other side," JA579; *see* JA992, JA994.

Confronting one of the few situations he had not planned out in advance, Roske began having second thoughts and did not know what to do—he "hadn't thought that far ahead."   JA603; *see* JA579-580.   As Roske lingered around the corner from Justice Kavanaugh's house, his sister fortuitously called.   JA580, JA701.   Over a twenty-minute conversation, JA701, Roske's sister "convince[d]" him not to go forward with the murder, JA563-564; *see* JA580.

Roske then called 911 because he did not "want[] to have any kind of violent encounter with law enforcement."   JA581.   When the police dispatcher answered, Roske hung up, saying he would call back.   *See* JA365.   Instead, the dispatcher called back and questioned Roske throughout the entire 13-minute call.   *See* JA365, JA995.   In response to those questions, Roske said he was "having suicidal and homicidal thoughts," was "from California," had "c[o]me [to Maryland] to act on them," and that he was carrying weapons.   JA995 at 00:24-00:42, 01:25-01:33,

16

04:51-05:18. The dispatcher pressed Roske on whether he came to Maryland because he "kn[e]w someone" there. JA995 at 05:27-05:29. After a brief pause, Roske responded, "Brett Kavanaugh," the "Supreme Court Justice." JA995 at 05:29-05:39. The dispatcher asked whether Roske had come to "hurt" Justice Kavanaugh, and Roske responded, "Correct." JA995 at 05:47-05:54.

The police responded and arrested Roske. Roske told the arresting officers that he was "mentally ill," "wanting to have a sense of purpose," and "thinking about killing Brett Kavanaugh and then killing myself." JA555-556. At the station, Roske told officers that when he learned of the "leaked draft" in *Dobbs*, he decided to "kill Mr. Kavanaugh" in order to "do something positive." JA577, JA579, JA609-610.

During his interrogation, Roske also told officers a host of falsehoods that subsequent evidence disproved. When officers asked whether Roske had chatted about the *Dobbs* opinion with anyone online, Roske lied and said "No." JA610. When asked whether he had any "accounts" with "chat rooms or forums" like "Discord," Roske lied again ("No."). JA611; *see* JA613 (admitting after follow-ups that he had a Discord account that he recently deleted). And he lied when asked whether two of his friends were "online in any of the groups" that he was in. JA621-622. Roske responded "No," JA622, even though he had discussed killing Justice Kavanaugh with both of them over Discord, *see* JA24, JA732-734.

## D. Indictment and Plea

A federal grand jury charged Roske with attempting to assassinate a Justice of the United States, in violation of 18 U.S.C. § 351(c). JA243-245. Roske agreed to be detained pending trial. JA246.

Roske's case was initially assigned to Judge Messitte. *See* JA234. The district court agreed to a number of extensions that Roske requested to "investigate defenses." *See, e.g.*, JA235-236, JA257-269. Along the way, the court inquired into whether Roske intended to pursue an "insanity defense" or needed a mental-health evaluation. JA250. Roske declined: He expressed "no concerns" about his competency and "no problems" communicating with counsel. JA253-254. Roske also confirmed that although he was on medication, it did not affect his ability to appreciate his present situation. JA252-254.

In November 2023, about a year-and-a-half into the proceedings, Roske told the court that he had "recently started" to engage in plea negotiations with the government. JA271. But by June 2024, no deal had been made. The government filed a status report asking the court to schedule trial if Roske did not accept a plea in three weeks. JA275. After no plea transpired, JA278, Judge Messitte scheduled the trial for June 2025, JA279.

In January 2025, Judge Messitte unexpectedly passed away, and Roske's case was reassigned to Judge Boardman. *See* JA237. In April, Roske pleaded guilty without a plea agreement. JA280-286, JA293-294, JA308-309.

In its presentence report (PSR), the Probation Office calculated Roske's Sentencing Guidelines base offense level as 33 and his criminal history category as I. JA650-651, ¶¶ 29, 41. The PSR then applied the acceptance-of-responsibility deduction in U.S.S.G. § 3E1.1, reducing Roske's offense level by three, JA651, ¶¶ 35-36, and yielding a tentative Guidelines range of 97 to 121 months in prison, JA163. The PSR next applied the terrorism enhancement in U.S.S.G. § 3A1.4(a), which added 12 offense levels and moved the criminal history category to VI for any federal crime of terrorism, JA650-652, ¶¶ 31, 42—including "congressional, cabinet, and Supreme Court assassination" in violation of 18 U.S.C. § 351, 18 U.S.C. § 2332b(g)(5)(B)(i). All told, Roske had a total offense level of 42 and a criminal history category of VI, resulting in an advisory Guidelines range of 360 months to life. JA658, ¶ 73. During the PSR process, Roske informed the district court for the first time that he identified as transgender. *See* JA652, ¶ 48; *cf.* JA290.

The government and Roske agreed that the PSR had correctly calculated his Guidelines range. JA331, JA787. As for the proper sentence, the government argued that Roske's crime warranted at least 360 months of imprisonment, followed

by a lifetime of supervised release. JA317. Roske requested 96 months of imprisonment and 25 years of supervised release. JA784.

### E. Sentencing

At sentencing, the district court adopted the PSR's Guidelines calculation and determined that Roske's Guidelines range was 360 months to life. JA8-10. The court heard argument from the government and defense; statements from Roske's father, mother, and sister; and an allocution statement from Roske. JA12-114. After adjourning briefly, the court announced Roske's sentence in a two-hour oral ruling. *See* JA115, JA186.

The district court began its analysis of the sentencing factors set forth in 18 U.S.C. § 3553(a) with a lengthy discussion of Roske's "history and characteristics." JA122-131. It extensively recounted Roske's struggles with depression, JA124-130, which the court surmised had "remained unresolved at least in part due to her gender dysphoria," JA125. In the court's view, Roske's struggles with "gender identity" had made "every step" of life "painful." JA125. With this context, the court emphasized what it saw as a "hearten[ing]" aspect of "this terrible offense":

> In the years since her arrest, Ms. Roske's parents have come to accept her trans identity and have worked to rebuild their relationship with their daughter. Ms. Roske's family is fully supportive of her. They frequently communicate with her while she's in detention,

> have regular video visits and calls. They also have started attending support groups for family members of the LGBTQ community and of those suffering from mental illness.
>
> I am heartened by how this terrible offense has drawn the Roske family closer and has helped them understand Ms. Roske's profound mental health struggles and accept her for who she is. In the years since she has been detained, Ms. Roske has resided in the mental health unit of the pretrial detention facility … [and] while there, she has been receiving medication, counseling, and hormone treatment.

JA128-129.

Finally, the district court credited Roske's retained clinical psychologist, who concluded that Roske's attempt to assassinate Justice Kavanaugh "did not derive from an antisocial or criminal orientation but from the manner in which her severe depression interacted with her immature cognitive style and social judgment." JA130; *see* JA866. The court also accepted the psychologist's assessment that Roske's "risk to engage in future acts of violence [and] criminality is low." JA130; *see* JA866.

Turning to the "nature and circumstances of the offense" under § 3553(a)(1), the district court acknowledged that attempting to murder a Supreme Court Justice is "extremely serious." JA131. But despite recounting the horrific facts of the offense, JA131-137, the court determined that the crime's defining moment was

Roske's responses to the 911 dispatcher's questions—which the court viewed as "truly remarkable" and "extraordinary," and something it had not seen in "17 years of experience" as a public defender and judge, JA139-140. While recognizing that the presence of two U.S. Marshals outside of Justice Kavanaugh's house "may have moved the needle" for Roske's decision to abandon his assassination plot, the court declined to "speculate about what would have happened if they weren't [there]," JA139-140—notwithstanding Roske's own confirmation to police on the night of his arrest that if the coast had been "clear," he intended to "[b]reak in" and "shoot" Justice Kavanaugh, JA584. The court instead stressed that Roske "never carried out her plan to kill the justice," "never used the firearm in her suitcase," never tried to "enter the home," and had "acted alone." JA137.

Likewise, while recognizing that it was "absolutely reprehensible" to try to effect political or legal change by killing a Supreme Court Justice, the district court emphasized that Roske was experiencing mental-health struggles at the time and chose to "abort her assassination plot" at the last minute. JA141, JA143. The court viewed those factors as establishing that Roske's sentence did not "need to be particularly long to sufficiently punish her"—especially given that Roske would be navigating federal prison as a transgender inmate. JA144; *see* JA145-146.

As for deterrence, the district court concluded that only a "minimal prison sentence" was necessary to specifically deter Roske and adequately safeguard the public under § 3553(a)(2)(B)-(C) because of "Roske's commitment to taking care of her mental health, which is extremely important in this case, and her family's acceptance of who she is and the commitment of support from her parents, sister, grandparents, and extended family." JA154. Indeed, the court concluded that Roske was no longer a "danger to the public" because "[h]er poorly managed mental health is now managed." JA156. The court also pointed to Roske's "lack of criminal history" and answers to the 911 dispatcher's questions, which it deemed a "spontaneous[] confess[ion]." JA152-153.

As for general deterrence and the need to promote respect for the rule of law under § 3553(a)(2)(A)-(B), the court acknowledged that Roske "nearly execut[ed] a plan to kill a Supreme Court justice," that there has been a surge in violence "against federal judges" and "elected officials," and that such conduct must be condemned— especially given the high-profile nature of this case. JA141, JA149. But the court asserted that what ordinarily matters for purposes of general deterrence is the "certainty" of a sentence, not its particular "length." JA149; *see* JA147-149. Although the court noted that the length of the sentence mattered to some extent in Roske's case because it would be "reported widely in the news," JA149, it concluded

23

that "no rational actor" would choose to "commit a crime like this" if he would face "a sentence roughly in the area of 10 years"—even though the court acknowledged that it lacked any "statistics or data to support" that conclusion.   JA149, JA152.

As for rehabilitation under § 3553(a)(2)(D), the district court placed a heavy premium on ensuring that Roske's "mental health" remained "managed."   JA156. According to the court, Roske's wellbeing would be best served out of prison, where Roske could better pursue "mental health treatment and therapy."   JA159. Meanwhile, the court acknowledged Roske's "gruesome" internet activity leading up to the assassination attempt, but dismissed that activity (*e.g.*, the websites with graphic knife-wound photos) as "at odds" with Roske's "nonviolent history" and how "her family and friends describe[d] her" in their sentencing submissions. JA157.   The court made no reference to the years' worth of record evidence showing that Roske had repeatedly contemplated killing others, including stabbing his own sister in the throat.

Finally, the district court took issue with the Guidelines themselves.   It focused on whether the terrorism enhancement in U.S.S.G. § 3A1.4—which called for a 12-offense-level increase and a criminal history category of VI for any federal crime of terrorism—ought to fully apply to Roske's attempted assassination offense. JA164-171.   The court accepted that the plain terms of the enhancement applied to

24

Roske's crime but disagreed with Congress's and the Sentencing Commission's "one-size-fits-all approach" for terrorism offenses.  JA165, JA169-171.  In the court's view, the facts of this case militated against the "wholesale" application of that enhancement.  It reasoned (again) that Roske "called 911" instead of entering Justice Kavanaugh's home and, more broadly, that Roske "acted alone," "was not part of any terrorist organization," and "did not have a manifesto."  JA168-170.  The court nonetheless agreed with the government that some sentencing increase based on the terrorism enhancement was appropriate and varied downward to treat the enhancement as only six offense levels, rather than twelve.  JA170-171.  Even that lesser enhancement was effectively eliminated, however, by the Court's decision to depart downward again by six levels under U.S.S.G. § 5K2.16 for Roske's disclosure of his offense to authorities.  JA171-173.

The district court ultimately sentenced Roske to 97 months of imprisonment, followed by a lifetime of supervised release.  JA176.

## SUMMARY OF ARGUMENT

Roske extensively and methodically planned to bring about political and legal change by murdering a Justice of the United States Supreme Court, and he nearly succeeded.  An eight-year sentence for that extraordinary crime—a 73% downward variance from Roske's Guidelines range of 360 months to life—is substantively

25

unreasonable. This Court should vacate Roske's sentence and reassign the case to another judge for resentencing.

A. Although the Guidelines are advisory, a sentencing court must still consider them. Where, as here, a district court radically varies from what the Guidelines provide, the court must offer a "more significant justification" than would be required for a smaller variance. *Gall v. United States*, 552 U.S. 38, 50 (2007). Absent a sufficiently compelling rationale, the sentence is substantively unreasonable.

B. The 22-year downward variance from the bottom of Roske's Guidelines range is unreasonable. The district court's leading rationale for leniency focused on Roske's mental-health struggles, especially in connection with his depression and gender dysphoria. But this Court has recently and repeatedly vacated sentences that rest massive downward variances on mental-health issues and other medical conditions. Instead, this Court has emphasized, what matters is whether the offender can appreciate the consequences of his actions or control his behavior. Roske was acutely aware of the consequences of assassinating Justice Kavanaugh— and relished them. Far from being unable to control his behavior due to his mental health, Roske thoroughly planned this assassination over the course of weeks.

26

C.  The district court compounded that error by minimizing or misapplying more probative sentencing factors.  An eight-year sentence, reflecting a 22-year downward variance, for a would-be assassin—who attempted to murder a Supreme Court Justice in order to flip the result of a pending case and the ideological balance of the Court—does not reflect the seriousness of the offense or encourage respect for the rule of law.  *See* 18 U.S.C. § 3553(a)(2)(A).  Nor does that remarkably lax sentence deter such reprehensible conduct from happening again, "protect the public," or provide "just punishment."  *See id.* § 3553(a)(2)(A)-(C).  It also gives short shrift to the intent of Congress and the Sentencing Commission that every federal crime of terrorism—including the attempted assassination of a Supreme Court Justice—should receive a harsh sentence.  *See id.* § 3553(a)(4)(A).

D.  This Court should reassign Roske's case to a new judge on remand.  The district court's sentence is not only unreasonably low, but it also rests on firmly expressed and erroneous beliefs.  None of those established views can likely be set aside on remand.  Under the unusual and extraordinary circumstances of this case, the public interest favors allowing a new judge to consider Roske's sentence with fresh eyes, subject to this Court's guidance.

## STANDARD OF REVIEW

"Appellate review of criminal sentences is limited to determining whether they are reasonable." *United States v. Zuk*, 874 F.3d 398, 409 (4th Cir. 2017) (quotation marks omitted). This Court reviews the "substantive reasonableness" of a sentence "under an abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 51 (2007). In doing so, the Court must "independently 'examine the totality of the circumstances to see whether the sentencing court abused its discretion in concluding that the sentence it chose satisfied the standards set forth in § 3553(a).'" *United States v. Fitzpatrick*, 126 F.4th 348, 353 (4th Cir. 2025). That includes taking into account "the extent of any variance from the Guidelines range." *Zuk*, 874 F.3d at 409. While this Court's review "must embrace a healthy respect" for a trial court's chosen sentence, "inherent in the idea of 'discretion' is the notion that it may, on infrequent occasion, be abused." *United States v. Abu Ali*, 528 F.3d 210, 266 (4th Cir. 2008).

## ARGUMENT

### A. The District Court's Variance Demanded a Sufficiently Compelling Justification.

There is no dispute that Roske's Sentencing Guidelines range was 360 months to life. JA8-10. That range, while advisory, "provide[s] 'the starting point' and

28

'lodestar' for sentencing." *United States v. Cannady*, 63 F.4th 259, 269 (4th Cir. 2023). Out of respect for the considered judgment of both Congress and the Sentencing Commission, as well as the broader importance of consistency in sentencing, a district court "*must*" continue to "remain cognizant" of the Guidelines "throughout the sentencing process," as they "anchor" its "discretion." *Peugh v. United States*, 569 U.S. 530, 541, 549 (2013).

Accordingly, when a district court imposes a sentence that varies from the Guidelines range, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50. A "major" variance "should be supported by a more significant justification than a minor one." *Id.* When the court imposes a sentence that is "unusually lenient" under the Guidelines, it must have "justifications" that are "sufficiently compelling to support the degree of the variance." *Id.* at 46, 50.

Unquestionably, Roske's sentence—97 months, a 73% downward variance from the bottom of the Guidelines range—is unusually lenient. *See, e.g.*, *Abu Ali*, 528 F.3d at 261 (concluding 360-month sentence that deviated below the Guidelines by "forty percent" was a "major" variance). To justify that extraordinary result, the district court needed to provide a "significant" and "sufficiently compelling" justification for its variance. *Id.* It did not do so.

**B.    The District Court Impermissibly Relied on Roske's Medical Condition to Justify its Exceedingly Light Sentence.**

The district court's leading and recurring justification for significant leniency—Roske's mental-health issues—is a rationale that this Court's precedent rejects.  Where, as here, a defendant's medical condition does not alter his ability to grasp consequences or control his actions, that condition cannot justify a major downward variance at the expense of other sentencing aims.  Yet here, the district court relied heavily on Roske's mental health to justify shaving more than 22 years off the sentence.  And the court did so despite overwhelming evidence—including from Roske himself—that he fully controlled and understood the consequences of his actions.  Indeed, by his own account, Roske sought to kill Justice Kavanaugh precisely *because* it would not only prevent an anticipated Supreme Court decision he disliked but also fundamentally reshape the Supreme Court's future.

1.    While it is of course "legitimate" (indeed, required) for a district court to consider the "'history and characteristics of the defendant,'" *Zuk*, 874 F.3d at 411 (quoting 18 U.S.C. § 3553(a)(1)), a court "risks abusing its discretion when it grants a defendant's request for a major downward variance based almost exclusively upon the defendant's personal history and characteristics," *Fitzpatrick*, 126 F.4th at 355. This Court has cautioned that sentencing courts must distinguish between the sort of

personal history that may garner general sympathy and the kind that can meaningfully absolve a defendant of criminal responsibility and thus support a major downward variance from the Guidelines.

This Court has held that when offenders point to a claimed medical condition (whether physical or mental), sentencing courts cannot "reliev[e]" a defendant "from the need for more serious punishment" if that condition "only marginally affected his criminal conduct." *Zuk*, 874 F.3d at 410-11; *see Fitzpatrick*, 126 F.4th at 355. Instead, a sentencing court must ask whether the condition "caused" the defendant's "criminal conduct" in some real sense—like impeding his ability to grasp the "consequence[s]" of his actions, understand that what he was doing was "illegal and wrong," or "control his behavior." *Zuk*, 874 F.3d at 411.

This Court has twice recently vacated major downward variances predicated on a defendant's medical condition where the condition lacked this causal link to the defendant's criminal conduct. In both *Fitzpatrick* and *Zuk*, this Court vacated major downward variances in cases involving child pornography (plus fraud, in the case of *Fitzpatrick*) that were premised on the defendant's autism. *See Fitzpatrick*, 126 F.4th at 353-55; *Zuk*, 874 F.3d at 410-11. Other circuits have followed a similar course where a district court awarded substantial leniency based solely on a medical

31

condition that had little bearing on the crime.  *See, e.g.*, *United States v. Thompson*, 130 F.4th 1158, 1166 (9th Cir. 2025).

2.  Here, the district court made the same mistake.  It relied "heavily" on Roske's mental health in its sentencing analysis.  *Zuk*, 874 F.3d at 410.  Rather than focusing on Roske's thoroughly plotted attempt to assassinate a sitting Supreme Court Justice, the court focused extensively on Roske's background and biography.  *See* JA122-131.  It spoke at length about Roske's "painful" "gender dysphoria" and the difficulties Roske had faced "liv[ing] authentically as a trans woman." JA125-128.  Meanwhile, the court consigned the "real harm" that Justice Kavanaugh and his family faced to a brief reference.  JA115.

Indeed, the district court suggested that Roske's crime was a net positive for him and his family.  The court emphasized that being "detained" allowed Roske "three years" to come to terms with "who I am and what I want," as Roske received "medication, counseling, and hormone treatment."  JA129.  Further, the court stressed, "In the years since her arrest, Ms. Roske's parents have come to accept her trans identity and have worked to rebuild their relationship with their daughter." JA128-129. The court stated that it was "heartened by how this terrible offense has drawn the Roske family closer and has helped them understand Ms. Roske's profound mental health struggles and accept her for who she is."  JA129.

32

The district court carried this theme—that Roske was better off now and that prison would unduly inhibit Roske's efforts to rebuild a life with his family—through the rest of sentencing. While Roske's crime was of course "extremely serious," the court dismissed any need for a "particularly long" prison sentence because Roske "was in the throes of a mental health crisis when she committed this crime" and because prison would likely be especially taxing for Roske as a transgender woman. JA143-146, JA176. Relatedly, only a "minimal prison sentence" was needed to protect the public and deter Roske, the court reasoned, because Roske's "poorly managed mental health is now managed," and a long stint in prison would get in the way of "Roske's commitment to taking care of her mental health" by perhaps denying Roske "the necessary mental health treatment and regular clinical contact she needs." JA154, JA156, JA160-161.

3. Missing from the district court's copious and sympathetic discussion of Roske's mental-health struggles was the element this Court's precedents require: a cognizable causal connection between Roske's "medical condition" and his "grave criminal misconduct." *Fitzpatrick*, 126 F.4th at 355; *accord Zuk*, 874 F.3d at 411. The court's failure to make that essential connection removes the foundation on which Roske's sentence was built. Indeed, the record refutes the idea that Roske's mental-health difficulties left him unable to "understand" the "consequences" of his

33

actions.  *See Fitzpatrick*, 126 F.4th at 355.   Rather, Roske wanted to murder Justice Kavanaugh precisely *because of* the consequences.   He said so repeatedly, insisting that assassinating the Justice was "obvious[ly]" the "right thing to do" if it meant "preventing the finalization of the decision to overturn *Roe*."   JA865; *see, e.g.*, JA732-734.   He discussed his planned assassination for weeks with people online, spelling it out in plain logical terms—"people have killed judges before," and here it would "change the votes [on the Supreme Court] for decades to come."   JA733-734.   Roske's extensive preparations confirm the same.   Even before the *Dobbs* leak, Roske pondered whose "death would have the biggest impact on the world."   JA372.   After the leak, he thought about "what would change" in the "immediate" future and over the "next few decades" if a "conservative" Supreme Court Justice were "replaced by a liberal," and he sought to compare the future he could bring about by killing Justice Kavanaugh with "the future" that would otherwise occur if "the supreme court retain[ed] the same members."   JA372.   The consequences were the entire point of why he attempted to assassinate Justice Kavanaugh.

Similarly, the record undercuts any notion that Roske was "unable to control his behavior."   *Zuk*, 874 F.3d at 411.   For one, Roske was an Eagle Scout, had graduated from college with honors, and was working as a substitute teacher at the time he attempted to assassinate Justice Kavanaugh.   *See id.* (emphasizing similar

34

facts).  Further, Roske's attempt to kill Justice Kavanaugh was not an impulsive decision.  Roske meticulously researched and planned the assassination for five weeks.  He could have stopped when the people he was talking to online pushed back on his plan; when he saw that Justice Kavanaugh's home address was not publicly listed; when he saw (repeatedly) what stabbing someone to death in the throat entailed; when waiting ten days to pick up his handgun in California; and when he missed his original cross-country flight.  Yet at each step, he consciously chose to continue with his plan.  Far from being unable to control his behavior, Roske was deliberate, methodical, and committed to a "sophisticated" scheme to assassinate a Supreme Court Justice.  *Fitzpatrick*, 126 F.4th at 355.

Nor did anything about Roske's condition prevent him from knowing that "what he was doing was both illegal and wrong."  *Zuk*, 874 F.3d at 411.  Quite the contrary:  Roske took steps before flying across the country to "hide" his identity as Justice Kavanaugh's would-be assassin.  *See Fitzpatrick*, 126 F.4th at 355.  He data-wiped his laptop to remove any evidence and deleted the Discord account where he posted most of his murderous messages.  JA613, JA630, JA698; *see* JA750.  He even researched the potential availability of an "insanity defense" and looked into countries that do not "extradite to the [United States]" and states where he could easily "live off the grid."  JA744-746, JA749.  That is the stuff of a conscious

criminal, not someone who is unable to understand or control their actions due to a medical condition. *See Zuk*, 874 F.3d at 411.

The district court's claim that Roske was "in the throes of a mental health crisis when she committed this crime," JA176, is not consistent with Roske's own statements and the rest of the record. Nothing in the record supports the idea that Roske lacked agency over the five-week period when he formulated his assassination plan and made decision after decision in furtherance of it. Nor does the record suggest that depression, suicidal ideation, or gender dysphoria brought about the conscious and sustained political calculation on which Roske's plan to target Justice Kavanaugh was based.

No one disputes that Roske suffered from "severe depression" that regularly left him without a "sense of structure and purpose." JA127, JA130. And it is true that Roske's clinical psychologist concluded that Roske's crime "derive[d]" from how his "severe depression interacted with [his] immature cognitive style and social judgment," as opposed to "an antisocial or criminal orientation." JA130. But that does not meaningfully "distinguish him from most people who commit crimes," *Fitzpatrick*, 126 F.4th at 355; *see Zuk*, 874 F.3d at 411, nor does it reflect the sort of legally meaningful nexus between condition and conduct that this Court's precedent requires. Again, as this Court has repeatedly held, criminals remain fully culpable,

36

no matter their medical condition, when they retain full agency over their actions—

here, attempting to kill Justice Kavanaugh to alter the direction of the Supreme

Court's jurisprudence in furtherance of political ends. *See Zuk*, 874 F.3d at 411;

*Fitzpatrick*, 126 F.4th at 355.

Relatedly, the district court suggested that Roske's violent conduct could have

been attributable to his anti-seizure medication. JA157-158. That is not supported

by the record. No medical professional opined that Roske's conduct was actually

caused by that (or any other) medication. Instead, the court based its assertion on a

doctor's description of the possible side effects of a drug Roske was taking, *see*

JA157-158, even though that doctor admitted that he "d[id] not have a physician-

patient relationship" with Roske, JA928, JA934. In any event, Roske had been

enamored with violence—such as "thoughts to kill [his] sister by stabbing her in the

throat," JA977, ¶ 59—for years before he started ███████████████████

███████ JA934; *see* JA975, ¶ 55 (providing date of Roske's first seizure). Roske

also had been ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████. Yet Roske stated at sentencing that he was "stable," JA87, and

the court found that his "mental health [was] now managed," JA156.

Finally, the district court noted that Roske had been suicidal at points. *See* JA130, JA136. But Roske told a medical provider in mid-May 2022—in the thick of his assassination preparations—that ███████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████ JA897-900. And although Roske reported feeling suicidal immediately following his arrest, *see* JA555-556 (telling officers that he was "thinking about killing Brett Kavanaugh and then killing myself"); *see also* JA865, JA923 (similar statements to defense experts), his actions leading up to the assassination attempt belie any general suicidal intent.

As explained, Roske researched extensively how to "get away" with murder by "not leaving evidence" behind. JA372, JA731. He destroyed evidence before flying across the country, JA613, JA630; brought multiple days' worth of medicine with him on the trip, JA643, JA804; researched other countries he could escape to without being extradited and states where he could "live off the grid," JA744-746; and possessed a variety of murder accessories—including gloves, padded shoes, and a mask—that indicated an intent to "avoid leaving evidence" of his identity, JA372

(Roske stating that he knew that using "gloves," "masks," and "duct-taping shoes" were "obvious things" to do in order to "not leav[e] evidence" behind at a crime scene); *see* JA640-642, JA671, JA678. It also bears repeating that Roske told police following his arrest that he would have gone through with the assassination if the coast had been "clear," JA584, and that he ultimately called 911 to avoid "any kind of violent encounter with law enforcement," JA581.

### C. The District Court Erroneously Deemphasized Other, More Relevant Sentencing Factors.

In placing an overarching and improper emphasis on Roske's medical condition, the district court lost sight of the fact that Roske was "not the victim[] of [his] crime and it is not for [his] benefit alone that the sentence must be imposed." *United States v. Christman*, 607 F.3d 1110, 1123 (6th Cir. 2010). Indeed, while the district court placed excessive weight on Roske's mental health, that attention came at the expense of far more probative sentencing factors that it also had to consider. *See Zuk*, 874 F.3d at 410. The court's analysis of those other factors was insufficient to justify a massive, 22-year downward variance for an attempted assassination of a Supreme Court Justice. Such "inadequate" reasoning further demonstrates why Roske's exceedingly light sentence is substantively unreasonable. *United States v. Bolton*, 858 F.3d 905, 915 (4th Cir. 2017).

### 1. *Roske's Sentence Fails to Account for the Seriousness of his Offense or the Need to Provide Just Punishment.*

"A sentence is substantively unreasonable when it is not 'proportionate to the seriousness of the circumstances of the offense and offender.'" *United States v. Schrank*, 975 F.3d 534, 536 (6th Cir. 2020); *see* 18 U.S.C. § 3553(a)(1), (a)(2)(A). An attempt to assassinate a senior government official is an "offense[] of the utmost gravity." *Abu Ali*, 528 F.3d at 264. In sentencing Roske to eight years in prison for attempting to assassinate a Supreme Court Justice in hopes of derailing a forthcoming decision and altering the Court's direction for years to come, the district court failed to "adequately appreciate" the gravity of Roske's offense. *Id.*; *see, e.g.*, *United States v. Ressam*, 679 F.3d 1069, 1090-91 (9th Cir. 2012) (en banc) (sentence that "did not properly account" for the "horrific" nature of a terrorism offense is "substantively unreasonable"). Roske spent weeks plotting to assassinate Justice Kavanaugh; traveled across the country with a gun, knife, tactical gear, and more; and came yards away from the Justice's front door at 1:00 a.m. A 97-month prison sentence fails to adequately capture the seriousness of that terrorism offense or provide just punishment. Indeed, it is 10 months below the average federal sentence for mere robbery. *See* U.S. Sent. Comm'n, Annual Report 17 (2025), https://www.ussc.gov/about/annual-report-2025.

Although "the district court acknowledged that [Roske] committed … serious crimes," it "went on to effectively negate these statements," minimizing the severity of Roske's conduct and thus the need for a long sentence. *United States v. Daoud*, 980 F.3d 581, 591-92 (7th Cir. 2020). It did so across two dimensions.

*First*, the district court determined that the severity of Roske's offense was significantly "mitigat[ed]" by the fact that Roske "abort[ed] her assassination plot when she arrived at the justice's house" and "called 911" to "confess[]." JA143. Indeed, the court said it was *that* fact—and not Roske's attempt to kill a Supreme Court Justice—that made Roske's case "so unique." JA143. But this "sanitized account[]" of Roske's conduct cannot sustain the remarkable leniency of Roske's sentence. *Daoud*, 980 F.3d at 592. For starters, Roske declined off-ramp after off-ramp during his weeks-long campaign to kill Justice Kavanaugh and almost succeeded in carrying out his plan. Nor was Roske's decision to give up his plot a spontaneous "change of heart," *Abu Ali*, 528 F.3d at 265, as his own words show. Although Roske, in preparation for sentencing, told his clinical psychologist that he had an epiphany upon arriving at the house and realized he "could not kill another person," JA865-866, Roske told the police a very different story in the immediate aftermath of the crime. The night of June 8, 2022, Roske admitted that the only reason he did not go straight from the taxi into Justice Kavanaugh's home to murder

41

him was that he spotted two people outside "keeping a lookout," JA579, and he later acknowledged that he "would have been stopped by the security detail" if he "had persisted with [his] plans," JA960-961. Had he not spotted anyone outside, Roske affirmed that his plan was to "[b]reak in" and "shoot" the Justice. JA584.

Confronted with an unanticipated security detail, Roske walked around the block to the street behind Justice Kavanaugh's house to figure out what to do next. JA579-580, JA603. Even then, it was not until Roske's sister fortuitously called him and "convince[d]" him not to go through with the murder that he relented in his assassination attempt. JA563-564. Only after that 20-minute call—taken a block away from Justice Kavanaugh's home while Roske was trying to evade detection by the Justice's security detail and was holding a suitcase full of equipment he intended to use to subdue the Kavanaugh family and murder the Justice—did Roske call 911 "to avoid a violent encounter" with police. JA581. And even *that* only goes so far. Roske hung up on 911 when he first called. *See* JA365. The only reason the dispatcher discovered Roske's plot was that *he* called Roske back and, over six minutes of directed questioning, eventually got Roske to affirm that he was in the neighborhood to commit a crime against Justice Kavanaugh. *See* JA995 at 05:45-05:55 (Roske responding "Correct" to question about whether he came to Maryland to "hurt" the Justice). The district court repeatedly characterized that single-word

42

response as a "spontaneous[]" and "unprompted" confession "to the aborted murder plot," JA140, JA143, JA153, JA176, but the record shows otherwise.

Of course, Roske's attempted assassination could have been worse (he could have entered the Kavanaugh home or shot at the Justice, for example). But the district court's assertion that Roske's behavior shortly before his arrest was "remarkable" and an "extraordinary" point in his favor, diminishing the lion's share of his past conduct and the severity of his offense, is unjustifiable. JA139-140. On his own telling, if the security detail had not been outside, Roske would have barged into Justice Kavanaugh's home; his sister had to "convince" him not to go through with the murder; and he called 911 because he was concerned that he would otherwise have a "violent encounter" with the police if he attempted to flee the Justice's neighborhood with a bag of homicide tools.

The district court also credited Roske for calling 911 instead of attempting to flee and avoid detection. JA140. But not even Roske thought that a scot-free escape was possible. The court hypothesized that Roske could have "called police, hidden her luggage somewhere, lied to [the police] about why she was there, and simply said she was having a psychiatric breakdown." JA140. That is implausible. Roske had no reasonable means to hide (apparently forever) a suitcase full of murder accoutrements in the neighborhood shrubbery. And there is no basis

43

for concluding that if Roske had "lied" to police about how and why he ended up next to Justice Kavanaugh's house (on the other side of the country from Roske's home), the lie would have held up—especially given his weeks of online messages detailing his murder plot.

In short, the district court minimized the seriousness of Roske's crime on the rationale that Roske "realized on her own that she was doing something terribly wrong when she got to Justice Kavanaugh's house, and she called the police to help her." JA156. But that is a thoroughly rebranded version of how even Roske described the events after his arrest.

*Second*, the district court insisted that it did not need to impose a "particularly long" prison sentence to "provide just punishment," primarily because Roske would likely have a difficult time in prison as a "transgender woman." JA144-145. The court seemed to lodge a policy objection that Roske would be housed in a "male-only BOP facility." JA146. But even before the recent executive order directing that inmates be housed according to their biological sex, *see* Exec. Order No. 14168, 90 Fed. Reg. 8615 (2025), over 99% of inmates who identified as transgender women were housed in men's facilities, *Doe v. Blanche*, 172 F.4th 901, 908 (D.C. Cir. 2026). And the ~1% who were not (about 18 people) all had "received long-term hormone therapy" and were "particularly vulnerable to violence, abuse, and

44

psychiatric harm in men's prisons," *id.* at 906, 908—traits that Roske does not share. At any rate, if Roske objects to the conditions of his confinement, he can bring that challenge later. His anticipated and speculative capacity to adjust to prison has little bearing on what is a just sentence for his crime. *United States v. Maddox*, 48 F.3d 791, 798 (4th Cir. 1995). Nor is there any apparent reason why Roske can reasonably be expected to adjust to prison for the next eight years, but not thereafter.

The district court also expressed its concern that under the executive order BOP cannot use "federal funds for gender-affirming care." JA145. But that does not necessarily mean that continued hormone treatments will be unavailable to Roske while in BOP custody. *See* BOP Program Statement 5260.01 at 7-9, https://www.bop.gov/policy/progstat/5260_001.pdf. In any event, this Court has already expressed skepticism about such "sweeping conclusion[s] that the Federal Bureau of Prisons categorically could not manage, must less treat," a given defendant's medical needs. *Fitzpatrick*, 126 F.4th at 352; *see id.* at 354. Such skepticism is especially warranted here, not least because the district court itself found that Roske's "mental health is now managed," JA156, thanks to the treatments received in federal detention, where Roske had been held since his arrest. Although Roske argued that there was "no certainty" those treatments would remain the same once he was transferred into BOP custody, he attributed both the stability and

management of his mental health to the "medication regimen [he] began in October 2024." JA956. Significantly, that regimen did not include the hormone treatments he began in June 2025. *See* JA976-977, ¶ 58. Moreover, Roske's own expert indicated that Roske would likely receive adequate mental-health care if he was classified at the right care level. *See* JA944-945.

### 2. *Roske's Sentence Undermines Respect for the Law and Fails to Provide General Deterrence.*

On his own telling, Roske's assassination plot directly targeted the pinnacle—and, by far, most heavily publicized—portion of the federal judiciary. His plan was to change the composition of the Supreme Court by killing one of its Justices, not only to prevent a forthcoming decision he disagreed with but also more broadly to alter the Court's direction "for decades to come." JA732-734. Indeed, he tracked down the home addresses of *three* other Justices who had joined in the draft *Dobbs* opinion and boasted online that he was "shooting for 3" if he could pull it off. JA733, JA745, JA749, JA752-754. Roske wanted to murder Justice Kavanaugh (and possibly other Justices) for one overarching reason: to fundamentally shift the ideological composition of the Supreme Court through violence. JA732-734.

Attempting to assassinate a Justice to change the outcome of a pending case and the direction of the Supreme Court is, quite literally, an assault on the rule of

law.  *See* 18 U.S.C. § 3553(a)(2)(A).  Punishing that offense in a manner commensurate with its seriousness is imperative, now more than ever.  Indeed, as this brief was being written, Justice Amy Coney Barrett's home was "swat[ted]" when someone made a fake emergency call of "gunshots heard" at her residence. Gary Grumbach & Kyla Guilfoil, *Supreme Court Justice Amy Coney Barrett's Home Targeted in Apparent 'Swatting' Incident*, NBC NEWS (May 28, 2026), https://www.nbcnews.com/politics/supreme-court/justice-amy-coney-barrett-home-targeted-apparent-swatting-incident-rcna347406.  The Chief Justice has explained that there has been "a significant uptick in identified threats at all levels of the judiciary."  John G. Roberts, Jr., Year End Report on the Federal Judiciary 5 (2024), https://www.supremecourt.gov/publicinfo/year-end/2024year-endreport.pdf.  And the Administrative Office of the United States Courts reports that in the past five years alone, the "U.S. Marshals Service has investigated more than 1,000 serious threats against federal judges and justices."  Robert J. Conrad, Jr., *Director's Message*, Admin. Off.: Annual Report (2025), https://www.uscourts.gov/data-news/reports/annual-reports/directors-annual-report/annual-report-2025.  All of this arises in the context of the broader and growing problem of political violence, including (as of this writing) three major assassination attempts against the President in the past two years.

The district court acknowledged those concerns. *See* JA141-142. But a 22-year downward variance simply does not send a "message" that addresses them in any meaningful way. *Zuk*, 874 F.3d at 411. After weeks of planning, Roske stood outside a Supreme Court Justice's home in the dead of night, ready and equipped to brutally murder him and subdue his family, all because Roske wanted to stop a forthcoming decision and shift the Court's future direction. Punishing that close call with a 73% downward variance does not "promote respect for the law" in any way; it diminishes it. *See* 18 U.S.C. § 3553(a)(2)(A).

Similarly, Roske's sentence fails to promote general deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). The district court doubted whether lengthy sentences deter at all, opining that generally the "certainty of punishment," not its "severity" or "length," is "what deters someone from committing crimes." JA147-149. The court insisted that it is "rare" that defendants make a "rational and calm" decision weighing the likelihood of punishment with its severity because "in the vast majority of criminal cases" the criminals are "poor, uneducated, lack employment opportunities, or are suffering from serious mental illness." JA150. Even so, the court acknowledged that the length of the sentence "matters" in a "high-profile case" like Roske's, where "the sentence will be reported widely in the news." JA149. It nonetheless concluded—admittedly, with "no statistics or data [in] support"—that

"no rational actor" would "attempt to harm or kill a judge" if they were to face a sentence "in the area of 10 years." JA151-152.

That reasoning is unsupportable. For starters, district courts lack discretion to discount wholesale the value of general deterrence under § 3553(a). "By including general deterrence as a required consideration, Congress embraced the idea that criminal sentences influence behavior in society"—in particular, "that the longer the sentence, the more it will discourage similar criminal conduct by others." *United States v. Arroyo*, 75 F.4th 705, 708 (7th Cir. 2023).

Deterrence is doubtless one reason why the federal criminal code prescribes long sentencing ranges for serious crimes—especially this one. Congress has made clear that it considers the attempted murder of a Supreme Court Justice a particularly serious offense, setting its maximum sentence as life imprisonment for the attempt alone (and authorizing death for those attempts that succeed), even if the defendant did not "kn[ow] that the victim of the offense was an individual protected by this section." 18 U.S.C. § 351(a)-(c), (h). And in expressly classifying any offense "relating" to the "assassination" of a member of the "Supreme Court" as a "Federal crime of terrorism," 18 U.S.C. § 2332b(g)(5)(B)(i), Congress further concluded that significant sanctions were necessary to broadly deter such dangerous conduct.

Those "judgment[s]" by Congress are entitled to far greater "respect" than what the sentence below provides. *Zuk*, 874 F.3d at 411.

The particular target of Roske's crime epitomizes that concern. The deterrent purpose of a criminal sentence is at its zenith when it involves an extremely high-profile victim like the officials listed in 18 U.S.C. § 351(a). The Supreme Court is a heavily publicized institution, and Justice Kavanaugh in particular is a well-known public figure. Roske's sentence speaks to the Nation. An eight-year sentence for an extreme and ideologically motivated assassination attempt aimed at altering the Supreme Court and thwarting its issuance of opinions does not warrant leniency. It demands a prison term that tells the world that going to the home of a judge or Justice to kill him will be severely punished.

### 3. *Roske's Sentence Fails to Afford Specific Deterrence or Protect the Public from Further Crimes.*

Even looking to Roske himself, the exceedingly lenient sentence he received is also deficient from the vantage of specific deterrence and public safety. *See* 18 U.S.C. § 3553(a)(2)(A), (C). Some attempts to commit crimes are spur-of-the-moment or short-lived. This one was not. Roske plotted Justice Kavanaugh's murder in fine detail over the span of five weeks. He picked his target based on whose death he believed would most affect the direction of the Supreme Court. He

pieced together where the Justice lived. He researched how to break into the Justice's home. He spent hours learning how to kill someone with a knife ("does twisting or dragging a knife cause more damage," JA749) or gun (which he practiced using at a shooting range). He methodically put together an assassination kit—lock-picks, duct tape, zip ties, etc.—so he could break into the Justice's home. And he sought to destroy evidence of his preparations and motives.

Roske's crime was "rational, cool and calculated," as well as long-running and nearly completed—the precise sort of crime that calls out for deterrence. *United States v. Howard*, 28 F.4th 180, 209 (11th Cir. 2022). Roske decided to commit an assassination based on a cold analysis of perceived costs and benefits, weighing the personal cost of the killing against what Roske viewed as its broader societal benefit. JA865; *see* JA732-734. Significant prison time affects such a calculus; overwhelming leniency does not. Roske himself effectively said as much. *See* JA731 (stating that "prison sounds worse" than "death" "[s]o if I did kill someone I would definitely try to get away with it").

The district court discounted virtually all of this on the theory that Roske had turned a new page in life and that his "mental health is now managed." JA156. To that end, the court insisted that per Roske's "family and friends," he is generally "not a violent person." JA156. It branded this five-week-long criminal episode as

"completely at odds with Ms. Roske's nonviolent history and how her family and friends describe her to me," coupled with Roske's decision to abort the assassination at the last minute. JA157. But as explained, Roske has been drawn to violence for the better part of a decade, even as his mental health has gone through cycles of stability—indeed, even in parallel with Roske ████████████████████. *See supra* pp. 7-8. Much of that violence was rationalized by Roske's utilitarian means-ends moral philosophy under which Roske alone decided whose deaths were societally beneficial—a philosophy that ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████. The district court grappled with none of this.

The district court briefly acknowledged the prospect that Roske's mental health may "falter[]" in the future. JA156. Still, the court reasoned that this would pose little threat to the public because Roske would be with his parents while on supervised release and would have "the support of Probation and the Court to correct course." JA156. But supervised release may not be treated as interchangeable with imprisonment. *United States v. Johnson*, 529 U.S. 53, 58-59 (2000). And despite his family's assurance that this time would be different, *see* JA105-106, it

bears remembering that Roske "committed the very offense[] at issue while living at home with his parents."  *Fitzpatrick*, 126 F.4th at 354; *see* JA583.

### 4. *The District Court Wrongly Disregarded the Terrorism Enhancement.*

The "sentence imposed by the district court [also] effectively negated" the "substantial upward adjustment for federal crimes of terrorism" that the Guidelines "specifically provide for."  *Ressam*, 679 F.3d at 1090.  Because its justifications for doing so were inadequate, this, too, was unreasonable.

Congress played an active role in crafting the Guidelines' terrorism enhancement.  *United States v. Hasson*, 26 F.4th 610, 621-23 (4th Cir. 2022).  Congress specifically directed the Sentencing Commission to create an "appropriate enhancement" for crimes involving "international terrorism."  *Id.* at 621-22.  After the Commission created a categorical enhancement (the same one in effect today), Congress further instructed the Commission to apply that enhancement to all "Federal crime[s] of terrorism."  *Id.* at 622 (quoting Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 730, 110 Stat. 1214, 1303).  Congress did so to ensure that those offenses were "adequately punish[ed]" through "substantial[]" periods of "jail time," both because they are especially blameworthy and to deter future acts of terrorism.  H.R. Rep. No. 104-383, at 87, 93 (1995); *see*

53

*United States v. Benkahla*, 530 F.3d 300, 313 (4th Cir. 2008) (enhancement designed so certain criminals "whose wrongs served an end more terrible than other crimes" are punished "more harshly"); *see also United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003).

At sentencing, everyone agreed that the terrorism enhancement applied to Roske's offense because the attempted assassination of a Supreme Court Justice is a "federal crime of terrorism." JA9-10; *see* 18 U.S.C. § 2332b(g)(5)(B)(i). But the district court effectively rejected that enhancement for purposes of sentencing. On policy grounds, the court shaved the enhancement down to only a six-offense-level increase (with no change to Roske's criminal history), which it then effectively eliminated by a further six-level downward departure. JA169-173. It accordingly treated Roske's offense as akin to a garden-variety attempted murder. *See* JA163.

Of course, the Guidelines are not mandatory. But where, as here, a district court effectively negates one of the Guidelines' applicable enhancements, that decision warrants "close[]" scrutiny for reasonableness. *United States v. Herrera-Zuniga*, 571 F.3d 568, 585-86 (6th Cir. 2009). And where, as here, a court "seeks to disagree" on "policy grounds" with "a guideline [that] comes bristling with Congress's own empirical and value judgments," it "faces a considerably more formidable task" than it would where the Sentencing Commission had more leeway

54

to make a policy judgment of its own. *United States v. Bistline*, 665 F.3d 758, 764 (6th Cir. 2012). The district court offered two main rationales for its disagreement with U.S.S.G. § 3A1.4's terrorism enhancement. Neither suffices.

*First*, the district court viewed Roske's conduct as an "atypical" instance of terrorism because he "acted alone," "was not part of any terrorist organization," and had no "manifesto." JA137, JA170. Those reasons are not persuasive. Lone-wolf terrorism is still terrorism. *See, e.g.*, *United States v. Le*, 902 F.3d 104, 116 (2d Cir. 2018). What matters, as Congress itself has made clear, is whether the offense "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). And that describes Roske's conduct to a tee—even if Roske's rationalization for attempting to assassinate Justice Kavanaugh (and other Justices if possible) was articulated over a series of online messages, instead of a single manifesto. Roske's stated purpose was to flip the balance of "power" on the Supreme Court by killing a "conservative" Justice so that his seat would be taken by a "liberal" who "wouldn't repeal [*Roe*] or gay marriage" and who would "change the votes for decades to come." JA732-733. All he had to do, Roske said, was kill Justice Kavanaugh and let the normal process by which "our government operates" take care of the rest: Roske believed that President Biden would pick

"replacements" more palatable to Roske and that Roske's disfavored political party could not "do shit about it." JA733-734. Far from "atypical," that is "heartland" terroristic activity. *See United States v. Stewart*, 590 F.3d 93, 173-74 (2d Cir. 2009) (Walker, J., concurring in part and dissenting in part).

*Second*, the district court believed a "one-size-fits-all" enhancement for all terrorism offenses was too "blunt" an "instrument," and it rejected the idea that all such offenders require significant sentences for deterrence purposes as unsupported by "any reliable empirical data" or the Commission's "expertise." JA165-166. The court thus declined to fully apply the enhancement to Roske because it believed that the enhancement "overstate[d]" his likelihood of recidivism and overlooked his willingness to rehabilitate. JA169-170.

That is both flawed and incomplete. Even limited to the lens of deterrence, it makes good sense for Congress and the Commission to conclude that all terroristic acts warrant higher sentences. As discussed, acts of terrorism by definition seek to accomplish broader societal objectives through violence, and a harsh punishment is necessary to offset that otherwise skewed scale. Multiple circuits have so held, as even the district court acknowledged. JA167-168; *see Ressam*, 679 F.3d at 1090-91; *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011); *Meskini*, 319

56

F.3d at 92; *see also Stewart*, 590 F.3d at 172-73 (Walker, J., concurring and dissenting in part).

Even putting deterrence to the side, however, the district court's analysis addresses only half the equation. As explained, Congress's directive was grounded not only in deterrence, but also in its judgment that certain terrible crimes demand a harsh sanction for retributive reasons. *See, e.g., Benkahla*, 530 F.3d at 313. And as to retribution, the district court offered no rationale at all. Yet where Congress exercises its "prerogative to dictate sentencing enhancements based on a retributive judgment that certain crimes are reprehensible and warrant serious punishment," any district court rejecting the resulting guideline "must contend" with that ground as well. *Bistline*, 665 F.3d at 764; *see Zuk*, 874 F.3d at 411. The district court did not even "attempt" to do so. *Bistline*, 665 F.3d at 764.

### D. This Case Should Be Reassigned

In addition to vacating Roske's sentence and remanding for further proceedings, this Court should reassign the case to a new judge for resentencing. The district court's 22-year downward variance rests on a series of firmly held "strong personal belief[s]" regarding the "appropriate" punishment in this case. *United States v. Slinkard*, 61 F.4th 1290, 1297 (10th Cir. 2023). As detailed above, the court staked out clear views about Roske's diminished moral culpability because

of his mental health; the supposed unprompted character of Roske's responses to the police dispatcher's direct questions; a need for leniency in light of the fact Roske would be housed in a male prison; the limited value of harsh sentences for deterrence purposes; and the allegedly "nonviolent" character of someone who, by his own admission, would have murdered Justice Kavanaugh if he had the chance. *See, e.g.*, JA146-149, JA157, JA176. It is unlikely that the court would be able to put those views "out of ... mind" on remand. *United States v. McCall*, 934 F.3d 380, 384 (4th Cir. 2019). And the "burdens of reassignment" do not outweigh its benefits. *Id.* This case has already been reassigned once, and a "new judge should be able to get up to speed quickly for sentencing a single defendant after a guilty plea." *Id.* at 385.

At a minimum, reassignment is appropriate to "best advance[]" the "appearance of fairness and impartiality." *McCall*, 934 F.3d at 384. The district court "expressed strong and erroneous views on the merits of [a] high profile case." *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 947 (9th Cir. 2013). Although the government certainly does not question the district court's "good faith or impartiality," this Court still must consider how the "public[]" would understand the circumstances of any remand. *McCall*, 934 F.3d at 384. Reimposition of a below-Guidelines sentence by the same judge could be perceived as an effort to save face; if the same judge were to change course, it could be taken as buckling to

pressure.   That dynamic is unfair to both sides and to the district court.   The better course is to reassign this case to a new judge on remand who can come to resentencing fresh and make an independent judgment with the benefit of this Court's guidance.

## CONCLUSION

The Court should vacate Roske's sentence as substantively unreasonable, remand for further proceedings, and reassign this case for resentencing.

Respectfully submitted,

John A. Eisenberg
Assistant Attorney General

Jeffrey M. Smith
Acting Chief, Appellate Section
National Security Division


A. Tysen Duva
Assistant Attorney General

Josh A. Goldfoot
Deputy Assistant Attorney General

Robert A. Parker
Chief, Appellate Section
Criminal Division

Kelly O. Hayes
United States Attorney

<u>/s/ David C. Bornstein</u>
Assistant United States Attorney
Chief, Appellate Division
United States Attorney's Office
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 290-4800

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B) because it contains 12,879 words, excluding the parts exempted under Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements set forth in Fed. R. App. P. 32(a)(5) and the type-style requirements in Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced serif typeface and plain, roman style using Times New Roman in 14 point.

Dated: June 22, 2026

/s/ David C. Bornstein
Assistant United States Attorney


## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2026, I electronically filed this brief with the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system and thereby electronically served a copy of it on Appellee Nicholas John Roske through his counsel of record, who is a registered ECF Filer.

Dated: June 22, 2026

/s/ David C. Bornstein
Assistant United States Attorney