**No. 25-4598**

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

NICHOLAS JOHN ROSKE,

*Defendant-Appellee*.

---

On Appeal from the United States District Court
for the District of Maryland, Southern Division
(The Honorable Deborah L. Boardman)

---

## APPELLEE'S RESPONSE BRIEF

---

JAMES WYDA
Federal Public Defender for the
District of Maryland

SAPNA MIRCHANDANI
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 344-0600
sapna_mirchandani@fd.org

*Counsel for Appellee*

# TABLE OF CONTENTS


Introduction ........................................................................................ 1

Jurisdictional Statement............................................................................ 3

Statement of the Issue ............................................................................. 3

Statement of the Case .............................................................................. 4

A. The Indictment and Guilty Plea.......................................... 4

B. The Presentence Report ...................................................... 5

C. The Government's Argument .............................................. 5

D. The Defense's Argument...................................................... 8

E. The Sentencing.................................................................... 11

1. The court's factual findings ...................................... 12

a. Ms. Roske took substantial steps toward a detailed plan to kill an associate justice and then herself ........................................................ 12

b. Ms. Roske voluntarily abandoned the plan, called 911, confessed, and cooperated with police................................................................ 14

2. The court's weighing of the sentencing factors .......... 19

a. The nature and circumstances of the offense under § 3553(a)(1)............................................. 19

b. The history and characteristics of Ms. Roske under § 3553(a)(1)............................................. 20

c. The need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment under § 3553(a)(2)(A)................................................... 21

d. The need to afford adequate deterrence under § 3553(a)(2)(B) ........ 23

e. The need to protect the public from further crimes under § 3553(a)(2)(C) ........ 25

f. The need to provide education, training, medical care, or other treatment under § 3553(a)(2)(D) ........ 27

g. The kinds of sentences available under § 3553(a)(3) ........ 28

h. The sentencing guidelines under § 3553(a)(4) ... 28

i. Policy statements under § 3553(a)(5) ........ 31

j. The need to avoid unwarranted sentencing disparities under § 3553(a)(6) ........ 32

3. The court sentenced Ms. Roske to 97 months of incarceration and a life term of supervised release .... 32

STANDARD OF REVIEW ........ 34

SUMMARY OF ARGUMENT ........ 36

ARGUMENT ........ 37

I. THE GOVERNMENT'S ARGUMENT ON APPEAL IS NOT TETHERED TO THE RECORD BELOW ........ 37

A. The Government Presents Its Own Narrative That Ignores the District Court's Clear Finding That Sophie Roske Voluntarily Abandoned the Offense and Called 911 to Surrender ........ 37

B. The Government Distorts the District Court's Reasons for Imposing a 97-Month Sentence ........ 43

1. The government is wrong that the district court "primarily" relied on Ms. Roske's mental health to justify a "22-year downward variance" ........................ 43

2. The government is wrong that the district court "discounted" the needs for specific deterrence and to protect the public from further crimes .................... 48

3. The district court emphasized—rather than "minimized"—the need for the sentence to provide deterrence, reflect the seriousness of the offense, promote respect for the law and provide just punishment ............................................................ 50

4. The government is wrong that the district court "disregard[ed]" the terrorism enhancement ................ 52

II. THE DISTRICT COURT'S IMPOSITION OF A SENTENCE AT THE LOW END OF THE ADJUSTED GUIDELINE RANGE AND A LIFE TERM OF SUPERVISED RELEASE IS SUBSTANTIVELY REASONABLE .................... 58

A. The Government Erroneously Focuses on the Extent of the Variance From the Recommended Guideline Range ..... 58

B. The Government's Reliance on *Fitzpatrick* and *Zuk* is Misplaced.................................................................... 61

C. In a Recent Comparable Case, the Defendant Received a 73-Month Sentence for the Attempted Murder of a Cabinet Nominee ............................................................ 63

III. EVEN ASSUMING, *ARGUENDO*, THIS COURT DETERMINES THE SENTENCE IS SUBSTANTIVELY UNREASONABLE, THERE IS NO GROUND FOR REASSIGNMENT TO A DIFFERENT JUDGE ..................... 67

CONCLUSION ......................................................................... 69

# TABLE OF AUTHORITIES

Cases

*Gall v. United States*, 552 U.S. 38 (2007) ........................................ *passim*

*Rita v. United States*, 551 U.S. 338 (2007) .............................................. 60

*United States v. Alhaggagi*, 372 F. Supp. 3d 1005 (N.D. Cal. 2019), *vacated*, 978 F.3d 693 (9th Cir. 2020) ............................................. 56

*United States v. Dais*, 482 F. Supp. 3d 800 (E.D. Wis. 2020) ................. 54

*United States v. Diosdado-Star*, 630 F.3d 359 (4th Cir. 2011)... 30, 35, 59

*United States v. Elsheikh*, 103 F.4th 1006 (4th Cir. 2024) ...................... 42

*United States v. English*, Dist. Ct. 1:25-cr-00134 (D.D.C. 2026)............ 63

*United States v. Evans*, 526 F.3d 155 (4th Cir. 2008)....................... 35, 59

*United States v. Fitzpatrick*, 126 F.4th 348 (4th Cir. 2025) ................... 61

*United States v. Fowler*, 948 F.3d 663 (4th Cir. 2020)............................ 35

*United States v. Fox*, Dist. Ct. 1:20-cr-0183 (W.D. Mich. 2023) ............. 56

*United States v. Galecki*, 932 F.3d 176 (4th Cir. 2019)........................... 67

*United States v. Garey*, 383 F. Supp. 2d 1374 (M.D. Ga. 2005), *aff'd*, 546 F.3d 1359 (11th Cir. 2008)............................................... 57

*United States v. Hasson*, Dist. Ct. 8:19-cr-0096 (D. Md. 2020) .............. 55

*United States v. Hawes*, 309 Fed. App. 726 (4th Cir. 2009) ............. 59, 60

*United States v. Heath,* 559 F.3d 263 (4th Cir.2009) .............................. 34

*United States v. Lawrence*, 349 F.3d 724 (4th Cir. 2003) ........................ 60

*United States v. Lewis*, 90 F.4th 288 (4th Cir. 2024) .............................. 28

*United States v. Mason*, Dist. Ct. 1:08-cr-0047 (W.D. Mich. 2009) ........ 57

*United States v. McCall*, 934 F.3d 380 (4th Cir. 2019) .......................... 67

*United States v. McLeod*, 972 F.3d 637 (4th Cir. 2020) .......................... 28

*United States v. Moreland*, 437 F.3d 424 (4th Cir. 2006) ....................... 36

*United States v. Muhtorov*, 329 F. Supp. 3d 1289 (D. Colo. 2018) ......... 54

*United States v. Myers*, 589 F.3d 117 (4th Cir. 2009) ....................... 34, 59

*United States v. Nance*, 957 F.3d 204 (4th Cir. 2020)............................ 35

*United States v. Provance,* 944 F.3d 213 (4th Cir. 2019) ........................ 36

*United States v. Smith*, 275 Fed. App'x 184 (4th Cir. 2008)............ 36, 59

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009)............................. 54

*United States v. Wooden*, 693 F.3d 440 (4th Cir. 2012) ..................... 41-42

*United States v. Zuk*, 874 F.3d 398 (4th Cir. 2017) ............................... 61

Statutes

18 U.S.C. § 351.................................................................................. 4, 64

18 U.S.C. § 3231........................................................................................ 3

18 U.S.C. § 3553............................................................................ *passim*

26 U.S.C. § 5861...................................................................................... 64

28 U.S.C. § 1291 .......... 3

40 U.S.C. § 5104 .......... 64

Antiterrorism and Effective Death Penalty Act of 1996, § 730, Public Law 104-132 (Apr. 24, 1996) .......... 53

Other Authorities

Floyd, Stephen, *Irredeemably Violent and Undeterrable: How Flawed Assumptions Justify a Broad Application of the Terrorism Enhancement, Contradict Sentencing Policy, and Diminish U.S. National Security*, 109 GEO. L.J. Online 142 (2020-2021) .......... 53

National Institutes of Justice, *Five Things About Deterrence*, (June 5, 2016) .......... 24

Tomlinson, Kelli D., *An Examination of Deterrence Theory: Where Do We Stand*, Federal Probation Journal, Vol. 80, No. 3 (Dec. 2016) .......... 24

## INTRODUCTION

The government appeals the district court's decision to impose a 97-month sentence and life term of supervised release on Sophie Roske[1] for the attempted murder of a Supreme Court justice—not because the court abused its discretion in arriving at that sentence, but because the government wants a different result.

The government also appears to want different facts. In its opening brief, the government describes a sentencing hearing at which a court is singularly focused on the defendant's mental health struggles and gender identity and shows little regard for the traditional goals of sentencing—including the need to deter would-be offenders and show respect for the law amid a rising tide of violent threats against public officials.

But the government was not describing what happened *here*. As this brief will explain, there is a vast disconnect between how the government describes this case and what the record shows. At the sentencing hearing, the court determined that Ms. Roske voluntarily

---

[1] This appeal is captioned *United States v. Nicholas John Roske*, which is the defendant's legal name. However, this brief will refer to the defendant by her chosen name, Sophie Roske, and use female pronouns.

abandoned her plan to kill the associate justice and decided to call 911 to surrender even though she was not under police detection and her offense was unlikely to be discovered. Instead of acknowledging those findings, the government presents its own narrative—one in which Ms. Roske did not abandon the plan, did not surrender, and only disclosed her plan to police to avoid being violently apprehended.

The government also presents a wildly inaccurate description of the court's reasoning. At the hearing, the court applied three distinct departures to Ms. Roske's guideline range based on the overstatement of her criminal record, its finding that this was not a "mine run" terrorism offense, and her voluntary abandonment and disclosure of the crime. The government does not address those departures. Instead, it cherry-picks and repackages the court's comments to present a different story—one of a court fixated on Ms. Roske's personal characteristics to the exclusion of everything else.

This brief seeks to lay out the principal reasons the government's appeal lacks merit. But a full reading of the district court's decision, by itself, stands as the clearest rebuttal to the government's claims.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this federal criminal case pursuant to 18 U.S.C.§ 3231. The court entered judgment on October 6, 2025, and the government filed a notice of appeal on October 31, 2025. JA-225-231, JA-538. The district court subsequently issued an amended judgment on December 11, 2025. JA-540-546. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion by sentencing Sophie Roske to the low end of her adjusted guideline range, 97-121 months, after making the following departures to her recommended guideline range, 360-months to life:

- departing from criminal history category VI (a result of the terrorism guideline) to criminal history category I because the latter category reflected her actual record (zero points) and unlikelihood to reoffend per U.S.S.G. § 4A1.3;
- departing downward by six offense levels to mitigate the effect of the terrorism guideline's automatic 12-level increase because this was not a "mine run" terrorism offense; and
- departing downward by six offense levels because Ms. Roske voluntarily abandoned and disclosed her offense to law enforcement pursuant to U.S.S.G. § 5K2.16.

## STATEMENT OF THE CASE

A. The Indictment and Guilty Plea

A grand jury charged Ms. Roske with the attempted murder of a justice of the Supreme Court, in violation of 18 U.S.C. § 351(c), on June 15, 2022. JA-243-45. She agreed to be detained and subsequently pleaded guilty without a plea agreement. JA-246, JA-280-286. In a letter of intent, Ms. Roske agreed that, if the case had gone to trial, the government would have proven the following facts beyond a reasonable doubt:

> On June 7, 2022, [Ms.] Roske flew from Los Angeles International Airport to Dulles International Airport with an unloaded firearm and separately packed ammunition in [her] checked baggage. When [she] landed in Virginia early on June 8, 2022, [she] traveled by taxi from the airport to the Montgomery County, Maryland neighborhood where an Associate Justice lived. Once there, [Ms.] Roske exited the taxi close to the residence and turned to walk away from the justice's house. Shortly thereafter, [she] called 911 to report that [she] was having suicidal and homicidal thoughts. [She] further stated that [she] was from California and that [she] 'came over here to act on them.' [Ms.] Roske also told the 911 dispatcher that [she] had weapons and burglary tools in [her] suitcase. Once in custody, [Ms.] Roske told law enforcement officers that [she] traveled from California to Maryland with the intent to kill the Associate Justice and then [her]self.

JA-282.

B. The Presentence Report

The presentence report assigned Ms. Roske a preliminary guideline range of 97-121 months (with an offense level 30 and criminal history category I) using the attempted murder guideline. *See* JA-650-651, JA-972-973. Because the offense was a felony that involved, or was intended to promote, a federal crime of terrorism, the PSR recommended a terrorism enhancement under U.S.S.G. § 3A1.4. The enhancement increased Ms. Roske's final offense level by 12 levels and automatically placed her in criminal history category VI. JA-650-651, JA-972-973. With a final offense level 42 and criminal history category VI, her guideline range was 360 months to life. JA-658, JA-980. Both parties agreed with that guideline range calculation. JA-9-10, JA-330-331, JA-786-787.

C. The Government's Argument

The government asked the court to sentence Ms. Roske to 360 months' incarceration and a life term of supervised release. *See* JA-12-61, JA-314-347, JA-523-537. It did not submit victim impact statements, nor did it present victim impact testimony. JA-6.

The government focused its argument in support of a 30-year term on three points. *First*, the government contended that Ms. Roske did not

voluntarily abandon her plan to kill the associate justice. It claimed the presence of U.S. Deputy Marshals sitting in unmarked SUV's outside the justice's house, whom Ms. Roske saw upon exiting the cab, had "forced [her] hand." JA-13; *see* JA-14-22. In support, it pointed to Ms. Roske's post-arrest statements to police that her plan had been to break into the house, kill the associate justice, then kill herself. JA-18-20.

*Second*, the government contended that Ms. Roske's meticulous planning over "a period of months" belied the claim she was experiencing a mental health crisis at the time of the offense. JA-23-25. It pointed to numerous occasions on which Ms. Roske could have changed her mind but did not—*i.e.,* when she conducted online searches, purchased weapons, or deleted data from her computer. *See* JA-20-29.

*Third*, the government stated that Ms. Roske's plan was not to kill herself—but escape—after killing the associate justice. JA-29-30. It noted that Ms. Roske was armed with tools to avoid leaving evidence behind, and her internet history revealed searches for "how to get away with murder" and countries without extradition treaties. JA-30.

Turning to the § 3553(a) sentencing factors, the government described Ms. Roske as "intelligen[t]," "clearheaded," and "rational." JA-30-33; *see* JA-336-337. It stressed that she attempted to commit both "terrorism and murder," which was compounded by an online comment that she hoped to remove "up to three" justices. JA-33-35; *see* JA-338-339.

Addressing the goals of sentencing, the government emphasized the need for general deterrence. JA-35; *see* JA-340-343. It said Ms. Roske's sentence "must send the very strong, very clear message" that "anyone who employs or attempts to employ violence to commit a political assassination" will face "decades in prison." JA-35-36.

As for specific deterrence, the government said protecting the public from Ms. Roske was "paramount" because she engaged in extensive planning and did not act impulsively. JA-36-37; *see* JA-343-344. Regarding the need to promote respect for the law, the government called the offense an attack on the concept of judicial independence enshrined in the Constitution. JA-35; *see* JA-338-339. With respect to avoiding unwarranted sentencing disparities, the government conceded that "there are really no other" comparable cases. JA-38.

At the close of the government's argument, the court noted that counsel did not address Ms. Roske's decision to call 911 and report herself to police. JA-39. The government repeated that Ms. Roske did not voluntarily abandon the offense but had been derailed by the deputy marshals. JA-39-40. It eventually conceded that Ms. Roske "made that 911 call," but claimed it warranted a 30-year sentence instead of life. JA-40.

The government also urged the court not to apply the voluntary disclosure departure under U.S.S.G. § 5K2.16 because Ms. Roske's offense could have been discovered. JA-44-47; *see* JA-46 ("I think it is hard to know what exactly would have happened had the defendant not called 911."). But the government did not point to any evidence showing that absent the 911 call, police were likely to discover Ms. Roske's plan.

D. The Defense's Argument

The defense asked the court to sentence Ms. Roske to 96 months' imprisonment and a 25-year term of supervised release. *See* JA-62-95, JA-781-845, JA-948-962.

The defense agreed with the government about several matters, including that: the terrorism enhancement applied to Ms. Roske's

offense, JA-9; she extensively planned,[2] and took substantial steps toward, a very serious offense, JA-62-63, JA-79; and she was fully responsible for her criminal conduct, JA-79, JA-84. *See* JA-848 (Ms. Roske: "I don't believe mental illness excuses what I did. Nothing excuses the actions I took.").[3]

But the defense disagreed with the government on key points. *First*, counsel contended that Ms. Roske voluntarily abandoned the plan *before* she exited the cab. JA-63-73. It pointed to Ms. Roske's statement that when she arrived in the "peaceful" neighborhood that morning, her abstract plan became concrete, and she realized she could not take another person's life. JA-71-77, JA-81; *see* JA-804-806, JA-849-50, JA-865-866. Counsel also explained that Ms. Roske's decision to call 911 was

---

[2] According to defense counsel, Ms. Roske's "obsessive planning" was a way to "soothe[] [her] anxiety and depression." JA-81. The record supported this claim, documenting hundreds of online searches on a variety of topics ranging from TV shows and movies (including Disney films) to how to file taxes. JA-951 n.5; *see* JA-515-519.

[3] A report submitted by defense counsel (without objection by the government) reflected the conclusions of Dr. Scott Bender that Ms. Roske suffered from a "complex history of depression, anxiety, gender dysphoria, and [a] seizure disorder." JA-925.

reminiscent of previous incidents when she sought help in "moments of crisis." JA-81 ("[S]he called for help, just like she did every other time she found herself on the brink. She stopped, she thought, and she changed her plan."); *see* JA-788-89, JA-956.[4]

*Second,* the defense emphasized that Ms. Roske's initial plan was to kill herself—not escape—after killing the associate justice. JA-63-73. Counsel pointed to Ms. Roske's consistent statements about being suicidal; her previous aborted suicide attempts; and the absence of an escape plan. Ms. Roske purchased a one-way ticket to Dulles Airport; she had no personal belongings (or a passport); she had only a couple days' worth of medicine; and she sent a goodbye message to her sister. JA-65-69; *see* JA-793-803, JA-952-953.

*Third,* counsel presented myriad reasons why a sentence below the guideline range was warranted, including: (i) Ms. Roske's youth at the

[4] The defense's sentencing memo recounted Ms. Roske's previous attempts to end her life, each of which she voluntarily abandoned. At the age of 19, when Ms. Roske was sitting in her car and planning to drive over a cliff, she reached out for help. At the age of 25, she halted plans to end her life on three occasions; each time, she sought psychiatric help and was hospitalized. JA-788-789, JA-856-857, JA-859-860.

time of the offense (26 years); (ii) her lack of any criminal record; (iii) her college education, which reduced the likelihood of recidivism; (iv) the difficult conditions of her pretrial detention; (v) that her conduct occurred during a period of unaddressed mental illness that had significantly improved with treatment;[5] and (iv) her strong family support. JA-83-86; *see* JA-813-831, JA-955-957.

Addressing the need for deterrence, the defense urged the court to send a different message to would-be offenders—that if they "stop, think, and call for help," as Ms. Roske did, their punishment will be measured. JA-85-89, JA-93-94, JA-826; *see* JA-832-840.

E. <u>The Sentencing</u>

At a sentencing hearing on October 3, 2025, the district court stated it had thoroughly reviewed the "voluminous" records in the case. JA-4-5. The parties then presented argument about the unresolved factual

[5] A letter dated September 23, 2025, from Dr. Bevin Merles, the deputy director of mental health at the jail where Ms. Roske was housed prior to sentencing, stated that following a recent adjustment to her medication, "her mental health symptoms began to resolve and she has displayed a significant improvement in her mood and decrease in her suicidal thinking." JA-946; JA-963-965.

disputes and explained their sentencing positions. JA-5-114. Afterward, the court took a one-hour recess to "process the information." JA-114-115.

1. *The court's factual findings*

The court announced its factual findings based on the physical, documentary, and electronic evidence presented—including security videos, police reports, a transcript of the 911 call, bodycam videos, and interview transcripts. JA-115-186.

a. Ms. Roske took substantial steps toward a detailed plan to kill an associate justice and then herself

The court recounted Ms. Roske's conduct over the months preceding the offense. In March 2022, Ms. Roske posted comments on a messaging platform indicating she had violent thoughts about those she perceived as bad. In one message, she wrote: "[I]f I did kill someone, I would definitely try to get away with it" because "my mental health is too poor for me to fear death, but prison sounds worse, to be monitored to the point where you can't even kill yourself." The next month, she posted, "Which person's death would have the biggest impact on the world?" JA-132.

On May 2, 2022, the draft of the Supreme Court's opinion in *Dobbs v. Jackson Women's Health Organization*, overturning *Roe v. Wade*, was

leaked. In its wake, Ms. Roske searched websites for information about *Roe v. Wade*, firearms, murderers, and mass shootings. She looked up how to break into a home, kill its occupants, and evade capture. She searched for information about stabbing someone and visited websites with images of knives lodged in people's necks. Around this time, she also searched for the home address of four associate justices, including Associate Justice Brett Kavanaugh. JA-132-133.

On May 10, 2022, Ms. Roske posted on Reddit, "Would Kavanaugh being removed from the Supreme Court help women long-term?" The following week, she asked which serial killer was "most careful," meaning "planned things out, very conscious of leaving evidence, purposely trying to avoid having a pattern, et cetera." She also posted, "What do you think would happen if Kavanaugh died?" On May 25th, she sent a message on Discord, saying, "The thought of *Roe v. Wade* and gay marriage both being repealed has me furious." Two days later, she sent a message stating she was "going to stop *Roe v. Wade* from being overturned." Asked what she intended to do, Ms. Roske replied, "Remove some people from the Supreme Court," stating she was "shooting for three." JA-133-134.

In late May and early June, Ms. Roske purchased items including a gun, shooting glasses, hearing protection, tactical gloves, zip ties, glass cutter, duct tape, pepper spray, and a day pass at a shooting range. On June 4, 2022, she purchased a plane ticket from Los Angeles Airport to Dulles Airport. She also looked up how to permanently delete her Discord account and wipe down a Windows drive. JA-134-135.

On June 6th, Ms. Roske traveled to Los Angeles Airport, but she arrived too late to check her bag and rescheduled the flight for the next day. On June 7th, she flew from Los Angeles to Dulles Airport. In her checked bags were, among other things, a knife, a gun, ammunition, burglar's tools, gloves, and zip ties. JA-135.

b. Ms. Roske voluntarily abandoned the plan, called 911, confessed, and cooperated with police

** Because the district court's findings regarding Ms. Roske's decision to abandon the offense and self-surrender were central to its sentencing decision—and are critical to this appeal—the following is a verbatim account of those findings:*

> In the early morning hours of June 8th, Ms. Roske took a cab from Dulles to the address of Justice Kavanaugh in Montgomery County. While in the cab, she texted her sister that she loved her. She arrived at the justice's home shortly after 1:00 in the morning.

When Ms. Roske arrived, two Deputy United States Marshals were parked in front of the justice's residence in unmarked SUV's. One of the Marshals, upon observing Ms. Roske exit the cab, opened the door of her SUV and illuminated the interior of the car. The Marshal remained inside the vehicle. She did not speak with or interact with Ms. Roske.

After exiting the cab, Ms. Roske walked directly eastbound past the justice's residence. She did not stop at the house or turn to look at it. At 1:17 a.m. Ms. Roske's sister called her. They spoke for about 20 minutes.

At 1:39 a.m., Ms. Roske called 911 from a street around the corner from the justice's residence. I have listened to that 911 call many times. The first thing Ms. Roske said was, I am having homicidal and suicidal thoughts. She said she had been having these thoughts for a while and came from California to act on them.

When the dispatcher asked her if she was thinking of hurting anyone, including herself, she responded yes. She told the dispatcher that she had an unloaded firearm locked in a case inside her suitcase, pepper spray, a knife and tools in her suitcase. She told the dispatcher that she had left her suitcase on the other side of the street and offered to move it further away from her before the police arrived. When she was asked if she needed medical attention, she said, I need psychiatric help.

The dispatcher asked if Ms. Roske knew anyone in Montgomery County, Maryland, and she identified the justice by name. The dispatcher asked if she had come to hurt herself and him, to which she replied, Correct. Ms. Roske told the dispatcher that she wanted to be fully compliant with the officers' instructions. She said, Whatever they—meaning the police—want me to do, I'll do. She offered to completely

empty her pockets.

She explained how she found the justice's address and that she had come to Maryland from California. She said she came alone. She told the dispatcher that she had been planning to kill herself, because she had been suicidal for a long time, and because she didn't think she could get away with "it," meaning murdering Justice Kavanaugh. She said she had been diagnosed with various mental illness[es]. She stayed on with the dispatcher for 13 minutes.

Eventually the police arrived at her location, and she disconnected the call. When police arrived, as we saw in the video today, she surrendered to police, submitted to arrest, and told the officers what she had planned to do. The police took her into custody upon their arrival, and she subsequently made several Mirandized statements to the police, admitting what she was there to do and her intent to kill Justice Kavanaugh.

Ms. Roske never carried out her plan to kill the justice. She never used the firearm in her suitcase. In fact, she never removed the firearm from the suitcase. She did not try to enter the home. Neither the justice nor his family, thank God, were hurt. Ms. Roske acted alone. She was not part of a group or conspiracy to commit terrorism. There was no manifesto found.

The parties debate why Ms. Roske decided not to commit the crime. The government takes the position that the presence of the U.S. Marshals in front of Justice Kavanaugh's house deterred her from committing it and that the Marshals' presence is the only factor that caused her to abandon her plans. In support, they have pointed to several postarrest statements by Ms. Roske, today during the sentencing hearing, which I have considered. From these statements, the government asked me to find by a preponderance of the

evidence that the presence of law enforcement is the reason Ms. Roske abandoned her plan.

The defense argues that Ms. Roske changed her mind in the taxi when she pulled into the justice's neighborhood and that the presence of law enforcement was not the reason she abandoned her plan to murder Justice Kavanaugh.

Based on the evidence before me, I cannot find by a preponderance of the evidence that Ms. Roske saw the U.S. Marshal open her door and the interior light come on. I simply cannot make that determination based on the evidence. The video does not show me exactly where Ms. Roske was when the door was opening.

I do find that Ms. Roske was getting out of the taxi, on the passenger side, and the taxi was facing towards the U.S. Marshal who opened the door, but I cannot tell that Ms. Roske saw the door open and the light come on. However, based on Ms. Roske's subsequent statements to the police that she saw a police presence and the fact that two U.S. Marshals were parked in identical unmarked vehicles, with one facing the wrong way on the wrong side of the street, I find that Sophie Roske knew law enforcement was outside the justice's home when she walked past the Marshal's car and pas[t] the justice's house, but I do not find that the presence of law enforcement was the only reason Ms. Roske did not commit the crime she had planned. Law enforcement presence may have moved the needle for her, but there is insufficient evidence before me that the presence of law enforcement was the only reason she abandoned her plans.

I also do not find that but for the presence of law enforcement, Ms. Roske would have executed her plan to murder an associate justice. I credit her postarrest statements to police that she wasn't sure she could actually kill someone and her post arrest statements that she came to a realization

when she arrived at the house that judges and their families are people too and that she could not harm anyone.

I also find that Ms. Roske's behavior after she observed law enforcement extremely telling about her state of mind that night. Ms. Roske walked away from Justice Kavanaugh's house undetected and unsuspected by law enforcement. The only person who knew she was there, to my knowledge, was her sister, Olivia.

When Olivia called Ms. Roske out of concern, Ms. Roske took the call, and after a 20-minute conversation, she decided to call 911 for help. It's truly remarkable, extraordinary, that Sophie Roske called 911 on her own, asked for help, and told the police unprompted about her crime. In my 17 years of experience in federal criminal law in the District of Maryland, as a public defender and as a judge, I have never heard of another criminal defendant doing that.

After walking away from Justice Kavanaugh's house, Ms. Roske had several options. She could have left the area, gotten a hotel, or returned to the airport[.] [O]r she could have called police, hidden her luggage somewhere, lied to them about why she was there, and simply said she was having a psychiatric breakdown[.] [O]r she could have taken a cab to the nearest emergency room, as she had done in the past. Or I suppose she could have tried to enter the justice's house from the backyard. She could have taken a taxi to another justice's home. She also could have declined her sister's call, but she didn't. She accepted the call, and what she said during that call with her sister, not the presence of the U.S. Marshals, prompted Ms. Roske to call 911 and ask for help.

Based on all of this evidence, I cannot conclude that Sophie Roske would have followed through with her plans to kill Justice Kavanaugh if the Marshals were not outside the house. We simply do not know what would have happened if

> the Marshals had not been there. I am deeply glad they were, but I cannot speculate about what would have happened if they weren't.
>
> As I've stated, the U.S. Marshals' presence outside the home did not cause Sophie Roske to call 911 for help 20 minutes later. Law enforcement did not know about Roske's plans to kill Justice Kavanaugh until Roske herself told them. If Roske had not called 911, the police never would have known about Roske or her crime, and we almost certainly would not be here today.

JA-135-141.

2. *The court's weighing of the sentencing factors*

a. <u>The nature and circumstances of the offense under § 3553(a)(1)</u>

After recounting the facts of the offense, the court stated: "What Sophie Roske did, devising and nearly executing a plan to kill a Supreme Court justice in an attempt to change a Supreme Court ruling and the composition of the Court is absolutely reprehensible and will be punished." The court lamented that the offense was part of a disturbing trend nationwide: "The news is replete with the rise in threats against federal judges because people disagree with their decisions . . . . Political violence should never be accepted, and it should never, ever be normalized." JA-141.

The court noted that although the government did not present victim impact statements or testimony, it had weighed the offense's harmful effects on the victims in determining the proper sentence: "I just want to acknowledge the real harm that was caused to Justice Kavanaugh and his family, the fear and anxiety that I am confident they experienced." JA-115. The court stated that Justice Kavanaugh was not only a member of the Supreme Court, but also "a public servant" and that "he and his family should never have to face a fear of threat because he does his job." JA-116.

b. The history and characteristics of Ms. Roske under § 3553(a)(2)

The district court described Ms. Roske as a 29-year-old woman who was raised as a male in a middle-class, Evangelical household in California. The court addressed Ms. Roske's difficulty fitting in during childhood and her persistent struggle with depression, which led to her first suicide attempt and hospitalization at the age of 19. The court relayed that Ms. Roske attended college and attempted to live independently after graduation, but she returned home despondent. Roughly two years before the offense, Ms. Roske began to identify as

transgender. She kept her identity a secret from her parents, who were part of a strict religious community. During that period, she remained haunted by thoughts of suicide, which led to three additional psychiatric hospitalizations in 2021, the year before the offense. JA-123-127.

While addressing Ms. Roske's history and characteristics, the court referenced several expert reports.[6] (The government did not challenge the reports or their findings, nor did it present any contrary evidence.) In particular, the court relied on the opinion of Dr. William Stejskal, who evaluated Ms. Roske and concluded that her offense "did not derive from an antisocial or criminal orientation" and that her risk of engaging in future criminal activity was low. JA-130-131, JA-852-867.

c. The need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment under §3553(a)(2)(A)

The court stated that a "significant period of incarceration" was needed to satisfy the goals of § 3553(a)(2)(A)—to reflect the seriousness

[6] The court attached the reports of Dr. William Stejskal, Dr. Scott Bender, and Dr. Arthur Grant as exhibits to the PSR. JA-7-8; JA-184-185; JA-853-867, JA-921-926, JA-928-30, JA-946-947. It ordered the BOP to "consult those reports, including Dr. Grant's medication recommendations, when coordinating Ms. Roske's care." JA-226.

of the offense, promote respect for the law, and provide just punishment. JA-142.

Regarding the first factor, the court said the attempt to kill a Supreme Court associate justice was "incredibly serious, full stop." But the court said it would be a "dereliction of [its] duty to not account for" Ms. Roske's decision to abandon the plan when weighing the seriousness of her conduct. The court cited *United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008), for the proposition that when assessing the gravity of a crime, the fact that a person changes his mind mitigates the seriousness of the offense. JA-142-143.

The court then announced that a "significant prison sentence" was needed to promote respect for the law—despite Ms. Roske's ultimate abandonment of the crime. It said: "Political violence, even unexecuted plans of political violence, must be prosecuted and punished so that the law is respected." JA-143-144.

As for "just punishment," the court stated that an offense "of this magnitude, even when the person aborts their criminal plan and reports themselves to police, must be punished with incarceration." JA-144. The

difficult question, the court said, was how much incarceration would be "just" in this case for many reasons. For one, Ms. Roske had never been to prison before. JA-144. Also, she had been held in restrictive conditions of confinement over the past three and a half years. She had been confined to a small two-person cell for at least 18 hours a day, six days a week. JA-144-145. She had only been allowed outside once per week to a large concrete cage; as a result, she "rarely [got] fresh air or [got] to see or feel the sun." JA-145. Additionally, Ms. Roske would soon be confined in an all-male facility though she identified as female. JA-146. Collectively, those factors affected how much incarceration would be "just." JA-144-146.

d. The need to afford adequate deterrence under § 3553(a)(2)(B)

The district court questioned both parties about general deterrence, which was "very important" in this case. JA-48-51, JA-93-94, JA-152. The court addressed the debate among judges and scholars about whether the certainty or severity of punishment provides the strongest deterrent

effect. JA-147.[7] It also stated that the presumption behind deterrence—that people weigh the possibility and severity of punishment before making a rational decision to engage in crime—was not necessarily supported by evidence-based studies. JA-150.

Ultimately, though, the court agreed with the government that in this "high-profile case," a severe sentence was needed:

> [I]n this particular case, I find that the goal of general deterrence cannot be achieved merely by the certainty of a sentence. The length of the sentence matters. . . .
>
> I think the government has the better argument. A message needs to be sent to people who are considering harming judges because they object to the judge's decisions. That message is especially important today, when threats against the judiciary seem to be at an all-time high. And that message is, if you attempt to harm or kill a judge, you will be prosecuted, removed from the community and your family, and you will be sent to prison for a long time.

JA-149-151. The court recognized that a 30-year term "may send a stronger deterrent message than, say, a 10-year sentence." But based on

---

[7] *See* National Institutes of Justice, *Five Things About Deterrence*, June 5, 2016, available at *https://nij.ojp.gov/topics/articles/five-things-about-deterrence*; Tomlinson, Kelli D., *An Examination of Deterrence Theory: Where Do We Stand*, Federal Probation Journal, Vol. 80, No. 3 (Dec. 2016) (finding social factors such as marriage, employment, disapproval, ostracism, and shame have greater impact on deterrence than severity of punishment).

the particular facts of this case, "a sentence roughly in the area of 10 years would be sufficient, but not greater than necessary to achieve the goal of general deterrence." JA-151-152.

With respect to specific deterrence, the court stated the goal could be satisfied with "a relatively short period of incarceration" for several reasons. JA-152. The court noted, *first*, that Ms. Roske "has no prior criminal history of any kind whatsoever" (not even a traffic ticket), so incarceration would serve as a serious sanction. JA-152; *see* JA-123, JA-652. *Second*, she "realized her conduct was wrong on her own," called 911, and "spontaneously confessed" to police. JA-153. *Third*, she "pleaded guilty without pursuing her non-frivolous motions to suppress evidence." JA-153. *Fourth*, she (and her family) had prioritized her mental health, ensuring she would have the "support and structure" to adjust to the community upon release. JA-154.

e. The need to protect the public from further crimes under § 3553(a)(2)(C)

The court addressed the need for the sentence to protect the public from further crimes by Ms. Roske under § 3553(a)(2)(C). It said the question was not whether Ms. Roske posed a danger in June 2022, but

"whether she poses a danger to the public now or in the future." JA-156. The court referenced Ms. Roske's sincere remorse, the descriptions by those who know her as gentle and caring, and her decision to "do the right thing and call police" in support of finding that she would not pose a danger to the public. JA-156 ("I cannot emphasize this enough. Ms. Roske realized on her own that she was doing something terribly wrong . . . and she called the police to help her. This is not the conduct of a person who is inherently dangerous.").

Responding to the government's emphasis on the graphic pictures of violence in Ms. Roske's internet search history, the court recognized that the searches were disturbing; but it found they were "completely at odds with [her] nonviolent history," reports of her gentle nature, and her decision to abandon the offense. JA-157.

The court also cited a report from Dr. Arthur Grant, a professor of neurology, who explained that one of the anti-seizure medications Ms. Roske was taking in 2022 was known to cause "psychiatric symptoms, including agitation, aggression, hostility, rage, fits of fury, and suicidal and self-harming behavior," especially in people with coexisting mood

disorders. According to Dr. Grant, whose opinion the court found reliable, Ms. Roske should not have been treated with that medication due to her depression. The court noted that the government "offer[ed] no response to Dr. Grant's opinion, certainly no expert who disagrees with his opinion." JA-157-158; *see* JA-61.

Finally, the court pointed to data from the Sentencing Commission showing that Ms. Roske has among the "lowest" risk of reoffending due to her age, lack of criminal history, and college education. JA-158-159.

f. <u>The need to provide education, training, medical care, or other treatment under § 3553(a)(2)(D)</u>

The court next addressed the need for the sentence to provide Ms. Roske with medical care in the most effective manner. JA-159-161. During argument, the government agreed that providing Ms. Roske with mental health care was "important" to sentencing and proposed that the BOP was capable of providing that care. JA-55-57.

The court expressed skepticism, referring to a 2017 report from the Office of Inspector General about BOP staffing shortages and a decline in the number of inmates receiving mental health treatment. JA-160. The

court also cited a statement from Jack Donson (a BOP correctional treatment specialist for 23 years) concluding it was unlikely the BOP could meet Ms. Roske's particular needs. JA-160-161; *see* JA-937-945. In reliance on those sources, the court decided that the goal of providing Ms. Roske with needed care could be satisfied by "a relatively short period of incarceration." JA-161.

g. The kinds of sentences available under § 3553(a)(3)

The court said that supervised release is part of the sentence of imprisonment—and, in fact, "serves rehabilitative ends" distinct from incarceration. JA-163 (citing *United States v. Lewis*, 90 F.4th 288 (4th Cir. 2024); *United States v. McLeod*, 972 F.3d 637 (4th Cir. 2020)). In this case, the court said, "supervised release is critically important to achieve the rehabilitative goals that incarceration simply can't." JA-163.

h. The sentencing guidelines under § 3553(a)(4)

The district court adopted the PSR's recommendation of a guideline range of 360 months to life based on a final offense level 42 and criminal history category VI. JA-8-10. That calculation included the terrorism enhancement under U.S.S.G. § 3A1.4. JA-9. As the court noted, the

enhancement caused Ms. Roske's guideline range to "skyrocket[] from a range of 8 to 10 years to a range of 30 years to life." JA-164.

During argument, the court asked the government about the terrorism enhancement—namely, the Commission's decision to add 12 offense levels and place offenders in the highest possible criminal history category. JA-40-44. The court also summarized its research on the guideline's history and its consultation with the Sentencing Commission in search of a policy statement. JA-164-169. It ultimately concluded that the guideline's "one-size-fits-all approach," which treated every offender the same regardless of his criminal record or the circumstances of his offense, did not satisfy Congress's directive to the Commission—that it "take into account any mitigating circumstances" and "carry out its directions in light of the factors set forth in § 3553(a)." JA-165-166. The court also saw no indication that the Commission had relied on empirical data or any particular expertise in crafting the terrorism guideline. JA-166-167.

The court ultimately found that Ms. Roske's offense was not a "mine-run" terrorism crime. JA-167-168 (referring to Ms. Roske's

decision to self-surrender and signs that she "appreciates the profound seriousness of her conduct, [] has repudiated it, is remorseful for it, and [] is committed not to do it again"). Guided by Supreme Court precedent authorizing sentencing courts to vary from the guidelines if they disagree with the Commission's views, the court announced it would vary from Ms. Roske's enhanced range in two ways.[8] JA-169.

*First*, finding that criminal history category VI "severely overstate[d] Ms. Roske's criminal history," the court departed to her "natural" criminal history category I. JA-170. *Second*, finding that an "across-the-board 12 level increase" did not account for the "extraordinarily unique facts of [Ms. Roske's] case"—including that she acted alone and abandoned the offense—the court applied a six-level (rather than 12-level) increase to her offense level. JA-171 ("[S]ome sort

[8] The district court applied "departures" to the range, in accordance with the 2025 version of the U.S. Sentencing Guidelines in effect at the time. The 2026 version of the U.S. Sentencing Guidelines removed "departures" and now refers to any deviation from the Guideline range as a "variance." This brief uses the terms interchangeably. *See United States v. Diosdado-Star*, 630 F.3d 359, 364-65 (4th Cir. 2011) ("[B]oth *Rita* and *Gall* make clear that the practical effects of applying either a departure or a variance are the same.")

of sentencing enhancement should apply because this crime did, in fact, involve attempted direct domestic terrorism”). With those changes, Ms. Roske’s adjusted guideline range was 188-235 months based on an offense level 36 and criminal history category I.

i. Policy statements under § 3553(a)(5)

The court said there was “no question” a downward departure was warranted by the “plain language” of U.S.S.G. § 5K2.16. JA-172. Referring to its earlier findings, the court stated: “Ms. Roske voluntarily disclosed to the authorities the existence of the offense before it was discovered, and she confessed to it. The offense was unlikely to have been discovered otherwise. In fact, I find the offense would not have been discovered were it not for [Ms.] Roske calling 911.” JA-172.

The court further concluded that the “motivating factor” for Ms. Roske’s 911 call “was the need for psychiatric help and regret about what she had come to D.C. to do”—*not* a belief that she would be caught. JA-172-173 (Ms. Roske “had no interaction with the Marshals outside the justice’s home, police were not onto her, [and] law enforcement did not know anything about this offense until Ms. Roske told them”).

The court applied a six-level downward departure, which it deemed "appropriate, some might even say conservative, in a criminal prosecution that never would have existed had the defendant not called the police." JA-173; U.S.S.G. § 5K2.16. With the six-level departure, Ms. Roske's adjusted guideline range was 97-121 months based on an offense level 30 and criminal history category I.

j. <u>The need to avoid unwarranted sentencing disparities under § 3553(a)(6)</u>

The court announced that it was not aware of any comparable cases. According to the PSR, no JSIN data was available because an insufficient number of defendants were sentenced under the same guideline with the same range as Ms. Roske. JA-38, JA-668, JA-990. Neither party presented comparable cases to the court, and the court's independent research did not reveal the existence of any. JA-174-175.

3. *The court sentenced Ms. Roske to 97 months of incarceration and a life term of supervised release*

The court sentenced Ms. Roske to 97 months' imprisonment, the low end of the adjusted guideline range, to be followed by a life term of

supervised release. JA-176.[9] The court summarized the goals of § 3553(a), explaining how it arrived at the 97-month term:

> For three of the goals, the need to provide Ms. Roske with medical treatment in the most effective manner, the need to deter her from committing future crimes, and the need to protect the public from her, *no additional incarceration is necessary*, provided, of course, there is a lengthy period of supervised release.
>
> For the other goals of sentencing, general deterrence, promoting respect for the law, and reflecting the seriousness of the offense *a significant prison term is necessary*. Reconciling these goals with each other, some of which are in tension with each other on the facts of this case, is not easy and as I've said, there is no scientific equation that yields the right result.
>
> However, in my discretion, *I place greater weight on the goals that I have found require a significant period of incarceration, general deterrence, promoting respect for the law, and reflecting the seriousness of the offense.*

JA-161-162.

---

[9] The court stated that the life term of supervised release "play[ed] a very important role" in Ms. Roske's sentence—as a rehabilitative tool, to deter further crimes, and to protect the public. JA-176. Among the special conditions are that Ms. Roske must live with her parents upon release, participate in mental health treatment, install computer monitoring software and permit the unannounced search of any monitored computer, and not travel to the Washington, D.C. metropolitan area without prior approval. JA-228-229, JA-543-544.

The court explained that it viewed the 97-month term as a "significant" punishment for Ms. Roske, who had "never served a day in prison before," suffered from serious mental health issues and hospitalizations, and made the decision to abandon the offense and turn herself in to authorities. JA-176. The court said the government's request for a 30-year sentence was "not reasonable" because it "was based solely on the guidelines" and failed to account for mitigating factors—particularly Ms. Roske's voluntary surrender. JA-177. It noted that in this very unusual case, Ms. Roske "was singularly responsible for instigating the prosecution against her." JA-176-177.

## STANDARD OF REVIEW

This Court reviews the reasonableness of a sentence under a deferential abuse of discretion standard. *United States v. Heath,* 559 F.3d 263, 266 (4th Cir.2009); *United States v. Myers,* 589 F.3d 117, 123 (4th Cir.2009) (citations omitted). First, the Court must determine whether a district court committed procedural error, such as failing to calculate or improperly calculating the Guidelines range, failing to consider § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to

explain its decision. *United States v. Fowler*, 948 F.3d 663, 668 (4th Cir. 2020) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)).

If the Court does not find significant procedural error, it turns to substantive reasonableness. This requires the Court to determine whether a district court abused its discretion "in determining that the § 3553(a) factors supported [the] sentence." *United States v. Diosdado-Star*, 630 F.3d 359 (4th Cir. 2011) (citing *Gall*, 552 U.S. at 56).

The fact that a sentence "deviates, even significantly, from the Guidelines range does not alone render it presumptively unreasonable." *United States v. Nance*, 957 F.3d 204, 215 (4th Cir. 2020). Appellate courts are expected to "examine the totality of the circumstances, and [] defer to the considered judgment of the district court." *United States v. Evans,* 526 F.3d 155, 165 (4th Cir. 2008); *Gall*, 552 U.S. at 51 (appellate court "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance"). That deference is due "because the sentencing judge is in a superior position to find facts and judge their import and [] sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and

gains insights not conveyed by the record." *Diosdado–Star*, 630 F.3d at 366 (internal quotations omitted).

This Court will generally find a sentence reasonable "if the reasons justifying the variance are tied to § 3553(a) and are plausible." *United States v. Moreland*, 437 F.3d 424, 434 (4th Cir. 2006). If a district court "took care to weigh the factors enunciated in § 3553(a)," its sentence should be affirmed even if this Court "might reasonably have concluded that a different sentence was appropriate." *United States v. Smith*, 275 Fed. App'x 184 (4th Cir. 2008) (citing *Gall*, 552 U.S. at 51); *see United States v. Provance,* 944 F.3d 213 (4th Cir. 2019).

## SUMMARY OF ARGUMENT

The argument is separated into three sections. The first section addresses the structural flaws in the government's argument—both its construction of a false narrative about Ms. Roske's offense and its distorted portrayal of the court's reasoning for imposing a 97-month sentence. The second section explains that Fourth Circuit precedent compels a finding that the district court's sentencing decision in this case was substantively reasonable. The third section addresses the government's invitation that if this Court finds Ms. Roske's sentence to

be substantively unreasonable, it reassign the case to a different judge for resentencing—a request that lacks any factual or legal support.

## ARGUMENT

### I. The Government's Argument on Appeal is Not Tethered to the Record Below

#### A. The Government Presents Its Own Narrative That Ignores the District Court's Clear Finding That Sophie Roske Voluntarily Abandoned the Offense and Called 911 to Surrender

The government constructs its own narrative of what happened below. This narrative not only ignores, but directly contradicts, the district court's finding that Ms. Roske voluntarily abandoned her criminal plan and called 911 to surrender—even though she was not under police detection and her offense was not likely to be discovered.

The government's preferred theory of the offense—which the district court considered and rejected below—is that the sole reason Ms. Roske did not follow through with her plan to harm the associate justice was the sighting of deputy marshals on the street outside his home. The government repeatedly states, as fact, in its brief that Ms. Roske "admitted that the only reason [she] did not go straight from the taxi into Justice Kavanaugh's home to murder him was that [she] spotted two

people outside 'keeping a lookout.'" ECF 23 at 41-42 (citing JA-579); ECF 23 at 42 (stating Ms. Roske "affirmed" that "[h]ad [she] not spotted anyone outside," she planned to "'[b]reak in' and 'shoot' the Justice."); ECF 23 at 43 (claiming that "[o]n [her] own telling, if the security detail had not been outside, Roske would have barged into" the justice's home).

That claim is patently false. The portion of the record to which the government cites are statements Ms. Roske made to police about her *initial plan* before traveling to Maryland. JA-584-585. Ms. Roske has never disputed that her original plan was, as the government says, to break into the associate justice's home, kill him, and then kill herself. JA-79, JA-84. But at no point did Ms. Roske attribute her decision to abandon the offense on June 8th to the marshals' presence.

Instead, Ms. Roske explained that when she arrived in the justice's neighborhood, she immediately felt a "strong gut reaction" that made her realize she could not take another person's life. JA-849-50, JA-865-866. Notably, the district court found that the evidence supported this explanation:

> . . . I do not find that the presence of law enforcement was the only reason Ms. Roske did not commit the crime she had

> planned. . . I also do not find that but for the presence of law enforcement, Ms. Roske would have executed her plan to murder an associate justice. I credit her post arrest statements to police that she wasn't sure she could actually kill someone and her post arrest statements that she came to a realization when she arrived at the house that judges and their families are people too and that she could not harm anyone.

JA-139. The government simply ignores that finding.

The government also offers another theory of the offense, stating that Ms. Roske did not intend to self-surrender when she dialed 911. The government claims that Ms. Roske "hung up" after placing the call and only admitted her plan under "direct questioning" by the dispatcher who returned the call.[10] ECF 23 at 16; JA-365. (In reality, Ms. Roske disconnected the first 911 call as she looked for a street sign to identify her exact location; she immediately answered the return call and continued the discussion she had initiated a moment earlier.)

To promote its theory, the government euphemistically refers to

---

[10] The government claims that "[t]he only reason the dispatcher discovered Roske's plot was that *he* called Roske back and, *over six minutes of direct questioning, eventually got Roske to affirm* that [she] was in the neighborhood to commit a crime against Justice Kavanaugh."). ECF 23 at 42 (emphasis supplied). The government does not theorize why Ms. Roske would have dialed 911 in the first place.

Ms. Roske's 911 call as her "responses to the 911 dispatcher's questions." *See* ECF 23 at 16 (Ms. Roske only admitted her plans "in response to [] questions" from the 911 dispatcher); ECF 23 at 21-22 (questioning why Ms. Roske was credited for "responses to the 911 dispatcher's questions"); ECF 23 at 23 (criticizing court for treating Ms. Roske's "answers to the 911 dispatcher's questions" as "spontaneous[] confess[ion]"); ECF 23 at 58 (Ms. Roske merely answered "the police dispatcher's direct questions").

On the few occasions the government attributes the 911 call to Ms. Roske, it claims that she only placed the call to avoid a "violent encounter" with law enforcement. ECF 23 at 4 ("Only then did Roske call 911 out of a desire to 'avoid a violent encounter' with law enforcement."); ECF 23 at 16 ("Roske then called 911 because [she] did not "want[] to have any kind of violent encounter with law enforcement."); ECF 23 at 39 ("[Roske] ultimately called 911 to avoid 'any kind of violent encounter with law enforcement'"); ECF 23 at 42 (Ms. Roske "call[ed] 911 'to avoid a violent encounter' with police"); ECF 23 at 43 (Ms. Roske "called 911 because [she] was concerned that [she] would otherwise have a 'violent

encounter' with the police if [she] attempted to flee the Justice's neighborhood with a bag of homicidal tools.").

But this theory presumes, without evidence, that the police *already knew* about Ms. Roske's plan to harm the associate justice, thereby making an "encounter" with police inevitable. It also flies in the face of the court's contrary finding: "*Law enforcement did not know about Roske's plans to kill Justice Kavanaugh until Roske herself told them.*" JA-141 (emphasis supplied); *see* JA-172-173 ("The motivating factor for [Ms. Roske's] disclosure to the 911 dispatcher and the police was the need for psychiatric help and regret about what she had come to D.C. to do.")

* * * * *

The government is so wedded to its own narrative of the crime that in the opening brief, it actually accuses the district court of "*thoroughly rebrand[ing]*" Ms. Roske's offense. ECF 23 at 44. This accusation stretches irony to its breaking point. The government is arguing that its *own* version of the offense—rather than the district court's findings—should control here.[11] *See United States v. Wooden*, 693 F.3d 440 (4th

---

[11] The government calls "implausible" the court's finding that Ms. Roske could have left the neighborhood after speaking with her sister.

Cir. 2012) (holding that appellate court may not reverse district court's finding, even if it would have reached different result, as long as its account is "plausible in light of the record viewed in its entirety").

Yet the government has relinquished the very tool at its disposal to contest the court's findings—which would be to argue they are clearly erroneous. To be clear, the government has *not* alleged here that any of the district court's findings were clearly erroneous. *See United States v. Elsheikh*, 103 F.4th 1006 (4th Cir. 2024) ("Under the clearly erroneous standard, we must uphold a district court's factual findings unless we are 'left with the definite and firm conviction that a mistake has been made' based on the entire record evidence."). Presumably, the government has forfeited this tool because it recognizes that each finding is amply supported below.

---

*See* ECF 23 at 43-44 (citing JA-140). The government says there is "no basis for concluding that if Roske had 'lied' to police," the statement "would have held up." ECF 23 at 44. But, just as with the government's contention that Ms. Roske only called 911 to avoid a violent encounter, this claim *also* presumes, without evidence, that police were aware of Ms. Roske's plan. The district court clearly found otherwise. *See* JA-139 ("Ms. Roske walked away from Justice Kavanaugh's house undetected and unsuspected by law enforcement").

### B. The Government Distorts the District Court's Reasons for Imposing a 97-Month Sentence

The government's brief not only ignores the district court's factual findings regarding the scope of Ms. Roske's offense, but also misrepresents the court's reasons for imposing a 97-month sentence. The government erroneously claims that the court: (i) primarily relied on Ms. Roske's mental health to justify a 22-year downward variance; (ii) discounted the need for specific deterrence and to protect the public from further crimes; (iii) minimized the goals of general deterrence, reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment; and (iv) disregarded the terrorism enhancement. *See* ECF 23 at 30-57. None of these claims are valid.

#### 1. *The government is wrong that the district court "primarily" relied on Ms. Roske's mental health to justify a "22-year downward variance"*

The government repeatedly claims that the district court's "leading rationale" for imposing a "22-year downward variance from the bottom of [Ms. Roske's] guideline range" was her "mental health struggles, especially in connection with [her] depression and gender dysphoria." ECF 23 at 26. The opening brief is replete with examples of this. *See* ECF

23 at 30 (referring to "mental-health issues" as the court's "leading and recurring justification for significant leniency"); ECF 23 at 30 (court "relied heavily on Roske's mental health to justify shaving more than 22 years off the sentence"); ECF 23 at 39 (court "placed excessive weight on Roske's mental health"); ECF 23 at 5 (court was driven by Ms. Roske's "mental health challenges, family connections, and alleged remorse."); ECF 23 at 39 (court "plac[ed] an overarching and improper emphasis on Roske's medical condition").

In reality, the court only considered Ms. Roske's mental health—without any objection from the government—to the extent it bore on discrete sentencing factors, *i.e.*: (i) its finding that Ms. Roske voluntarily abandoned the offense under U.S.S.G. § 5K2.16, just as she had abandoned previous suicide attempts; (ii) its finding that she was unlikely to commit further crimes or pose a danger to the public under § 3553(a)(2)(B) and (C); and (iii) its finding that she would receive more effective mental health care in the community under § 3553(a)(2)(D).

Still, in the court's analysis of *all* relevant § 3553(a) factors, it determined that the mitigating factors related to Ms. Roske's mental

health were *outweighed* by the competing goals of providing deterrence, reflecting the seriousness of the offense, showing respect for the law, and providing just punishment. In the court's view, the latter goals demanded a "significant" sentence. JA-161-162.

Despite the court's clear explanation, the government commits itself to portraying the court as singularly focused on Ms. Roske's mental health and/or gender identity.[12] While the word limit of this brief prevents a full recounting of the government's misrepresentations, one example is its frequent misappropriation of the court's comment that it need not impose a "particularly long" sentence on Ms. Roske because she had no criminal history. While addressing how much incarceration would be "just" in this case, the court stated on one occasion: "Given that [*Ms. Roske] has not been to jail before*, the length of the prison sentence in my estimation does not need to be particularly long . . . ." JA-144.

---

[12] The government claims that the court "focused extensively on Roske's background and biography" and "spoke at length" about her "gender dysphoria" and difficulty of life as a trans woman. ECF 23 at 20-25, 32 (citing J.A. 125-28). But as a full reading of the transcript reveals, the government places far greater emphasis on Ms. Roske's gender identity than the court did below. *See* ECF 23; JA-115-186.

In the government's hands, that passage takes on a life of its own. The government repeatedly uses the phrase, linking it to all manner of sentencing factors—none containing what the court actually said. According to the government, the court:

- "discounted the need for **deterrence** and just punishment, opining that Roske 'does not need [a] *particularly long* [sentence]' to sufficiently punish her," ECF 23 at 6;

- viewed Ms. Roske's "**mental illness** as a reason her sentence 'did not need to be *particularly long* to sufficiently punish her'—especially given that Roske would be **navigating federal prison as a transgender inmate**," ECF 23 at 22;

- "dismissed any need for a '*particularly long'* prison sentence because Roske '**was in the throes of a mental health crisis** when she committed this crime' and because **prison would likely be especially taxing for Roske as a transgender woman**," ECF 23 at 33; and

- "insisted that it did not need to impose a *'particularly long'* prison sentence to 'provide just punishment,' primarily because Roske would likely have a **difficult time in prison as a 'transgender woman**,'" ECF 23 at 44.

In a similarly deceptive maneuver, the government portrays the court as treating Ms. Roske's mental illness as the overriding concern where it had no role at all. In one example, the government says the court "recogniz[ed] that it was 'absolutely reprehensible'" to attempt to kill an

associate justice, but "*emphasized that Roske was experiencing mental-health struggles at the time* of the offense." ECF 23 at 22 (citing JA-141, JA-143) (emphasis supplied). But on the transcript pages cited by the government, the court only addresses the "reprehensible" nature of Ms. Roske's offense; it makes no mention of her mental health.

Even setting aside these flagrant misrepresentations, the government's argument still fails. This is because the district court did not apply a "22-year variance" from the recommended guideline range. It applied three distinct departures—none of which were based on Ms. Roske's mental health and none of which the government challenges here. The first departure, from criminal history category VI (enhanced by the terrorism guideline) to criminal history category I (her natural category) rested on the court's finding that she had no prior record and posed little risk of reoffending. The second, a 6-level (rather than 12-level) enhancement under the terrorism guideline, rested on the court's finding that this was not a "mine run" terrorism offense. The third, a 6-level downward departure for Ms. Roske's voluntary disclosure of the offense, rested on the court's finding that her conduct satisfied the

criteria of U.S.S.G. § 5K2.16. JA-163-173.

2. *The government is wrong that the district court "discounted" the needs for specific deterrence and to protect the public from further crimes*

The court thoroughly addressed both the need for specific deterrence and the need to protect the public from further crimes. JA-152-159.

Indeed, the court even recognized the government's concern over Ms. Roske's internet search history, which contained violent searches, images, and comments. But it counterbalanced the evidence of Ms. Roske's violent-themed searches with a wealth of evidence indicating she would *not* pose a danger in the future, including: the absence of any prior criminal conduct; her expressions of remorse and decision to plead guilty without pursuing non-frivolous legal challenges; the consistent descriptions of her as a gentle, nonviolent person; her improved mental health and commitment to prioritizing the same in the future; her strong family support; and the fact that, on the morning of the offense, she "realized her conduct was wrong on her own," called 911, and "spontaneously confessed" to police. JA-152-154; *see* JA-156-157 ("This is not the conduct of a person who is inherently dangerous.").

The court additionally relied on two uncontested expert reports. The first, from a licensed clinical psychologist, concluded that Ms. Roske's offense "did not derive from an antisocial or criminal orientation" and that her risk of engaging in future criminal activity was low. JA-130-131. The second, from a neurologist, suggested that Ms. Roske's behavior may have been linked to an anti-seizure medication known to have psychiatric side effects. JA-157-158. Finally, the court relied on Sentencing Commission data identifying Ms. Roske as having the "lowest" risk of reoffending due to her age, lack of criminal history, and college education. JA-158-159.

As the record shows, the court did not "discount" the need for deterrence or the need to protect the public from further crimes. Instead, the court thoroughly examined the evidence and concluded that Ms. Roske was unlikely to pose a danger in the future. JA-156-159. Even so, as a safeguard, the court imposed a special condition of supervised release requiring that any computer she use have monitoring software that will be subject to unannounced searches by a U.S. Probation Officer—a violation of which could result in additional incarceration.

3. *The district court emphasized—rather than "minimized"—the need for the sentence to provide general deterrence, reflect the seriousness of the offense, promote respect for the law, and provide just punishment*

The government contends that the district court placed "excessive weight on Roske's personal history at the expense of far more probative sentencing factors under 18 U.S.C. § 3553(a), including the need to ensure just punishment, further respect for the rule of law, promote public safety, and deter the defendant and others from committing such heinous acts in the future." ECF 23 at 5-6; *see* ECF 23 at 27 (stating court "minimiz[ed] or misappl[ied] more probative sentencing factors"). In a related vein, the government contends that the court incorrectly focused on the *certainty* of Ms. Roske's sentence rather than its *severity*, undermining the goal of general deterrence. ECF 23 at 23.[13]

Both contentions—which are the product of the government's cherry-picking and repackaging of the court's statements—are flatly

[13] During argument, the district court asked the government for data or evidence to support its proposition that a 30-year sentence was necessary to deter would-be offenders. The government admitted that it did not have any such data. *See* JA-47-52.

wrong. In fact, the court concluded that a "significant period of incarceration" was needed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment under § 3553(a)(2)(A). JA-142. It also found that those goals *outweighed* other factors—including the history and characteristics of Ms. Roske and the need for effective medical care. In the court's view, absent the goals requiring a severe sentence, further incarceration beyond the three and a half years Ms. Roske had been in custody was not necessary. But because a longer sentence was needed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, it imposed a "significant" 97-month term. JA-161-162.

With respect to deterrence, the court agreed with the *government* that the length of the sentence was important in this case. It determined that Ms. Roske's case was *not* a typical case in which "the certainty of punishment rather than the length of the sentence might achieve [] general deterrence." JA-149. Instead, it said, "[t]his is a high-profile case, in which the sentence will be reported widely in the news during a time when our country is experiencing an alarming uptick in political

and ideological violence." For that reason, the court explained, "the goal of general deterrence cannot be achieved merely by the certainty of a sentence. The length of the sentence matters." JA-149.

The government is entitled to its opinion that Ms. Roske's sentence should have been greater. But it should not mislead this Court by asserting, as it does in the opening brief, that the district court "minimized" the very goals it emphasized below.

4. *The government is wrong that the district court "disregarded" the terrorism enhancement*

The government also claims that the district court "disregarded" the terrorism enhancement—an argument that is clearly belied by the record. ECF 23 at 24-25, 53-57. The court applied the terrorism enhancement after finding that Ms. Roske's offense was among those crimes specified in the guideline and that it had been "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." JA-164-171; U.S.S.G. § 3A1.4(a).

During argument, the court questioned government counsel about the guideline's enhancements—both the 12-level increase to one's offense

level, without gradations, and the automatic assignment of the highest criminal history category, regardless of one's record. Despite the court's invitation, the government did not provide any analysis of the guideline or support for applying those enhancements to this case. JA-40-44.

The court also independently consulted with the Sentencing Commission and examined the guideline's "limited history." It explained that Congress provided "little guidance" to the Commission when it expanded the enhancement to include domestic offenses. JA-165-166. And it found the guideline's blunt categorical impact to be "particularly striking" because it created tension with Congress's directive that the Commission "take into account any mitigating circumstances" and "carry out its directions in light of the factors set forth in § 3553(a)." JA-166; *see* Antiterrorism and Effective Death Penalty Act of 1996, § 730, Public Law 104-132 (Apr. 24, 1996).

Further, the court found no indication "that the Commission relied on any reliable empirical data or a particular expertise" in determining that every terrorism offense warranted the same treatment.[14] JA-166-

[14] *See* Stephen Floyd, *Irredeemably Violent and Undeterrable: How*

167. *See United States v. Stewart*, 590 F.3d 93, 147 (2d Cir. 2009) (addressing illogical severity of enhancement); *United States v. Muhtorov*, 329 F. Supp. 3d 1289, 1302 (D. Colo. 2018) ("[T]he basic problem with the [terrorism] Guidelines is the utter vacuity of empirical evidence or facts employed by the Sentencing Commission in forming them."); *United States v. Dais*, 482 F. Supp. 3d 800, 803 (E.D. Wis. 2020) (finding terrorism guideline operates "contrary" to theory "that the offense level will reflect the seriousness of the offense, increasing incrementally based on specific aggravating facts, and the criminal history category will reflect the risk to the public, based on the defendant's prior record").

In considering the vast array of offenses that qualify for a terrorism enhancement, including those that put hundreds of lives at risk, the court concluded that Ms. Roske was "not the mine-run terrorism defendant."

---

*Flawed Assumptions Justify a Broad Application of the Terrorism Enhancement, Contradict Sentencing Policy, and Diminish U.S. National Security*, 109 GEO. L.J. Online 142 (2020-2021) (concluding that "[a] narrower application of [§] 3A1.4 would enable judges to consider an offender's unique characteristics and history in line with the Guidelines' overarching goals.").

JA-167; *see* JA-168 (referring to Ms. Roske's decision to self-surrender and signs she "appreciates the profound seriousness of her conduct, [] has repudiated it, is remorseful for it, and [] is committed not to do it again"). The court stated that "[i]n this particular case, with this particular defendant," the "wholesale application of the terrorism enhancement" would not satisfy the goals of sentencing under § 3553(a). JA-169. Citing Supreme Court authority, including *Gall v. United States*, 552 U.S. 38 (2007), authorizing courts to "vary from the guidelines if [they] disagree with the Sentencing Commission's views," the court stated, "I do that now." J.A.-169.

The court found, *first*, that criminal history category VI "severely overstate[d] Ms. Roske's criminal history," which consisted of zero points. It reassigned her to criminal history category I. JA-169-170. In support, the court referenced other cases where courts applied the § 3A1.4 enhancement but reverted to the defendant's natural criminal history score. *See United States v. Hasson*, Dist. Ct. 8:19-cr-0096, ECF 134 at 168 (D. Md. Mar. 31, 2020) (departing to criminal history category I "for the fairly simple reason" that "the defendant has no criminal history" in

terrorism case where district court found the defendant stockpiled weapons and planned domestic attacks, including against specific members of Congress); *United States v. Fox*, Dist. Ct. 1:20-cr-0183, ECF 851 at 26-30 (W.D. Mich. Apr. 7, 2023) (departing to criminal history category I for defendant with no criminal record convicted of terrorist plot to kidnap governor); *United States v. Alhaggagi*, 372 F. Supp. 3d 1005 (N.D. Cal. 2019), *vacated and remanded on other grounds*, 978 F.3d 693 (9th Cir. 2020) (departing to criminal history category I for terrorism defendant convicted of attempted material support for ISIS because "[t]here is no published statistical data demonstrating that defendants convicted of . . . anti-terrorism statutes . . . are any more likely to be recidivists than any other first offenders.").

*Second*, the court found that the enhancement's "across-the-board 12-level increase for everyone" failed to account for "any of Ms. Roske's specific characteristics or the extraordinarily unique facts of this case." JA-170 (noting that Ms. Roske "acted alone, was not part of any terroristic organization, did not have a manifesto, and ultimately decided against committed violence and self-reported"). The court applied a six-

level, rather than 12-level, enhancement, to Ms. Roske's offense level. JA-171. *See United States v. Mason*, Dist. Ct. 1:08-cr-0047, ECF 201 at 103 (W.D. Mich. May 8, 2009) (applying eight-level, rather than 12-level, terrorism enhancement where defendant set off bomb and burned down research facility at Michigan State University); *United States v. Garey*, 383 F. Supp. 2d 1374, 1380 (M.D. Ga. 2005), *aff'd*, 546 F.3d 1359 (11th Cir. 2008) (applying six-level, rather than 12-level, terrorism enhancement where defendant was convicted of threatening to bomb various buildings in case where no one was injured).

Far from disregarding the terrorism enhancement, the district court weighed the guideline's history, purpose, elements, application in traditional "heartland" cases, and outsized impact in this particular case. Following that analysis, the court concluded that the guideline's blunt enhancement to Ms. Roske's recommended range undermined, rather than furthered, the sentencing goals of § 3553(a).

## II. THE DISTRICT COURT'S IMPOSITION OF A SENTENCE AT THE LOW END OF THE ADJUSTED GUIDELINE RANGE AND A LIFE TERM OF SUPERVISED RELEASE IS SUBSTANTIVELY REASONABLE

### A. The Government Erroneously Focuses on the Extent of the Variance from the Recommended Guidelines Range

The government's argument focuses on the extent of the difference between the 97-month sentence imposed on Ms. Roske and the 30-year term at the low end of the recommended guideline range. Its opening brief frames the issue here as: "[W]hether a 97-month sentence for Roske's attempted assassination of a Justice of the United States Supreme Court—a 73% downward variance from the bottom of [her] agreed-upon Guidelines range—is substantively reasonable." ECF 23 at 2; *see* ECF 23 at 29 ("Unquestionably, Roske's sentence—97 months, a 73% downward variance from the bottom of the guidelines range—is unusually lenient.").

The government's emphasis on the extent of the variance from the recommended guideline range is misplaced. In *Gall v. United States*, the Supreme Court "explicitly rejected the use of such a 'rigid mathematical formula . . . as the standard for determining the strength of the

justifications required for a specific sentence.'" 552 U.S. at 47. As this Court has explained, "the fact that a sentence is 200%, or even 300%, above the Guidelines range does not render a sentence unreasonable per se." *United States v. Hawes*, 309 Fed. App. 726, 734 (4th Cir. 2009). Rather, the "relevant inquiry is whether the justification for such deviation is 'sufficiently compelling to support the degree of the variance.'" *Gall*, 552 U.S. at 50.

In accord with that principle, this Court routinely affirms the substantive reasonableness of sentences that vary sharply from the recommended Guidelines range. *See*, *e.g., United States v. Diosdado-Star*, 630 F.3d 359, 366-67 (4th Cir. 2011) (affirming substantive reasonableness of 84-month sentence, which was 2100% greater than recommended range of 4-10 months); *United States v. Myers*, 589 F.3d 117 (4th Cir. 2009) (finding 300% upward variance to 360-month term substantively reasonable); *United States v. Evans*, 526 F.3d 155 (4th Cir. 2008) (finding more than 500% upward variance to 125 months substantively reasonable); *United States v. Smith*, 275 Fed. App'x 184, 188 (4th Cir. 2008) (affirming substantive reasonableness of 24-month

term that was 70% below recommended range because court balanced seriousness of offense against defendant's age, lack of criminal history, low risk of recidivism, positive family role, and community support); *United States v. Lawrence*, 349 F.3d 724, 727 (4th Cir. 2003) (finding 262-month sentence, a 340% upward variance from recommended range, substantively reasonable); *United States v. Hawes*, 309 Fed. App. 726 (rejecting argument that defendant's 120-month sentence, which was more than 400% upward variance, was unreasonable on its face).

In other words, the reasonableness of a sentence depends on the reasons for—not the extent of—any variance from the Guidelines range. And in this case, the district court "considered the parties' arguments and ha[d] a reasoned basis for exercising [its] own legal decisionmaking authority." *Rita v. United States*, 551 U.S. at 338, 356 (2007). The court weighed every sentencing factor identified in § 3553(a), applied them to the unique facts of the case, and selected a term that was sufficient, but not greater than necessary, to serve the goals of sentencing. The government's protestations to the contrary—and its insistence that the court improperly based its decision on a single factor to the exclusion of

others—is demonstrably false.

### B. The Government's Reliance on *Fitzpatrick* and *Zuk* is Misplaced

The government relies heavily on two Fourth Circuit opinions to argue that the district court abused its discretion here. ECF 23 at 30-39; *United States v. Fitzpatrick*, 126 F.4th 348 (4th Cir. 2025); *United States v. Zuk*, 874 F.3d 398 (4th Cir. 2017). In both cases, this Court vacated the imposition of a time-served sentence that was based exclusively—or almost exclusively—on the defendants' neurocognitive conditions.

In *Fitzpatrick,* the district court relied solely on the defendant's autism and youth, without considering other § 3553(a) factors, to impose a 17-day (time served) sentence for fraud and child sexual abuse material offenses. 126 F.4th at 353. In *Zuk*, the district court deemed the defendant's autism and risk of abuse in prison as the "primary driver" in its decision to impose a 26-month (time served) sentence for child sexual abuse material offenses. 874 F.3d at 401.

The government claims that the district court made the "same mistake" here as the courts did in *Fitzpatrick* and *Zuk*.[15] ECF 23 at 32. The government is wrong for at least two reasons. *First*, the district court did not base *any portion,* let alone all, of the variance from the recommended guidelines on Ms. Roske's mental illness. As explained above, the court reached the adjusted guideline range by applying three distinct departures related to Ms. Roske's overstated criminal history category, its finding that the was not a "mine run" terrorism crime, and Ms. Roske's decision to voluntarily abandon and disclose her offense.

*Second*, while the court considered Ms. Roske's mental illness to be mitigating to the extent it bore on discrete sentencing factors, in the final analysis, the court gave far greater weight to the goals of general

[15] In an attempt to draw a comparison between this case and *Fitzpatrick* and *Zuk*, the government borrows an argument from those cases that is inapposite here. It contends that the court did not find a nexus between Ms. Roske's mental illness and her criminal conduct. ECF 23 at 33-36; *see* ECF 23 at 34 (Ms. Roske's conditions did not leave her "unable to 'understand' the 'consequences' of [her] actions"). The government's argument is badly misplaced. Ms. Roske never claimed her mental illness "shield[ed] her from culpability." ECF 23 at 5. Likewise, the court never suggested it viewed Ms. Roske's mental illness as an excuse for her criminal conduct.

deterrence, reflecting the seriousness of the offense, showing respect for the law, and providing just punishment. JA-161-162. The court stated that the latter goals would be served by a roughly 10-year sentence (the top of the adjusted guideline range), suggesting that the collective mitigating factors resulted in, at most, a 24-month variance to the low-end term of 97 months. JA-151-152. For these reasons, the opinions in *Fitzpatrick* nor *Zuk* are not relevant here.

### C. In a Recent Comparable Case, the Defendant Received a 73-Month Sentence for the Attempted Murder of a Cabinet Nominee

At the time of Ms. Roske's sentencing in October 2025, the district court commented on the absence of any comparable cases. It said that a comparable case would be one in which "an individual [] attempted to assassinate a judge or justice or another public official, like a senator." JA-174.

A comparable case emerged just two months ago. *United States v. English*, Dist. Ct. 1:25-cr-00134-RC (D.D.C. Aug. 18, 2026). In late 2024, Ms. English, a 23-year-old woman with no criminal record, spent weeks plotting an attack on political leaders in Washington, D.C. After driving

from Massachusetts to D.C., Ms. English arrived at the Capitol on January 27, 2025, the day of the Senate confirmation hearing for Scott Bessent, the then-nominee for Secretary of the U.S. Treasury. Intending to kill Mr. Bessent, Ms. English arrived with several Molotov cocktails and a knife. She spent an hour looking for an opening into the building and, believing she had been spotted by law enforcement, Ms. English turned herself into the Capitol Police.

Ms. English was charged with three offenses: (i) attempted murder of a cabinet member nominee, in violation of 18 U.S.C. § 351 (the same statute Ms. Roske was convicted of violating); (ii) carrying an incendiary device on the grounds of the Capitol, in violation of 40 U.S.C. § 5104(e)(1)(A); and (iii) unlawful receipt, possession, or transfer of a firearm, in violation of 26 U.S.C. § 5861(d). She pleaded guilty to the latter two offenses in exchange for the government's agreement to drop the attempted murder charge.[16] At sentencing, Ms. English faced a statutory maximum sentence of 15 years. She also faced a guideline

[16] The court did not apply the terrorism enhancement to Ms. English's offense.

range of 97-121 months (based on a final offense level 30 and criminal history category I), calculated using the attempted murder guideline.

Ms. English's case is strikingly similar to Ms. Roske's—with the key difference that in this case, Ms. Roske voluntarily turned herself in to police even though she was *not* under police detection. At sentencing in Ms. English's case, the government made the same arguments it made here. It described Ms. English's offense as a "pre-planned, cold-blooded political assassination." It stressed that Ms. English's offense was "particularly troubling" because the Molotov cocktails[17] were "likely to cause extreme pain, death, and serious bodily injuries" to numerous people in a public space. *English*, ECF 46 at 25. The government emphasized the need for the court to send a "very strong message" of general deterrence to would-be offenders. *English*, ECF 46 at 20. For that purpose, it sought a sentence of 121 months, the high end of the guideline

[17] It was unclear whether the Molotov cocktails in *English* were functional. But the "impossibility" of the crime in *English* mirrors the instant case. This is because Ms. Roske did not have access to the weapons in her suitcase. They were in a locked container inside the suitcase, and the suitcase was zip-tied shut during the flight. Ms. Roske did not have a tool to cut the zip-tie. After Ms. Roske's arrest, the police used a knife to cut the zip-tie from the bag to access the weapons. JA-807.

range. In support, the government noted that the average sentence for similar offenses was 92 months and the median sentence was 85 months. *English*, ECF 46 at 30. On August 18, 2026, the district court sentenced Ms. English to 73 months' incarceration and a three-year term of supervised release. The government has declined to appeal that sentence.

In contrast to *English*, where the government sought a 10-year term for essentially similar conduct, the government argued in this case that nothing less than 30 years would suffice to send a "strong message" to would-be "political assassins." ECF 23 at 24. What is more, in its opening brief, the government criticizes as "unsupportable" the district court's statement that a roughly ten-year sentence (which it sought for Ms. English) would sufficiently deter would-be offenders. ECF 23 at 49.

Ms. Roske urges this Court to consider the government's position in *English*—and the dramatically different position it has taken in this case—when deciding whether the district court abused its discretion when it sentenced Ms. Roske to 97 months' incarceration and a life term of supervised release.

## III. Even Assuming, *Arguendo*, This Court Determines the Sentence is Substantively Unreasonable, There is No Ground for Reassignment to a Different Judge

The government asks this Court, if it finds Ms. Roske's sentence is substantively unreasonable, to reassign the case to a different judge for resentencing. ECF 23 at 57-59. It claims the unusual remedy is warranted here because the court's decision "rest[ed] on firmly expressed and erroneous beliefs" that "likely [cannot] be set aside on remand." ECF 23 at 27.

This Court has stated that "[r]eassignment is only warranted in unusual circumstances." *United States v. Galecki*, 932 F.3d 176, 195 (4th Cir. 2019) (internal citation and quotations omitted); *see United States v. McCall*, 934 F.3d 380 (4th Cir. 2019). The government claims that the district court's "firmly expressed and erroneous beliefs" provide such circumstances here. ECF 23 at 27. But for all the reasons catalogued in this brief, the record does not support the government's narrative. A full reading of the transcript reveals, instead, that the court thoroughly questioned both parties about matters in dispute; examined how the goals of sentencing could be achieved in this case; weighed every

sentencing factor based on record evidence; and relied primarily on the guidelines themselves—including departures recognized by the Commission—to arrive at the proper sentence. The court even set aside its own reservations about whether the certainty or severity of a sentence provides a stronger deterrent effect, agreeing that in *this* particular case, the "length of the sentence matters." JA-149.

The government's request for reassignment lacks not only factual support but also legal support. Unsurprisingly, the government has not cited a single comparable case that resulted in reassignment. Even in *Fitzpatrick* and *Zuk*—which the government heralds as "substantive reasonableness" comparators—this Court remanded the matters to the original judges for resentencing—despite their imposition of time-served sentences after failing to weigh all relevant § 3553(a) factors.

The government also asks this Court to view its reassignment request as a neutral plea for fairness. It clarifies that "the government certainly does not question the district court's 'good faith or impartiality'" in this case. ECF 23 at 58. While that may be true, it is difficult to reconcile the government's purported belief in the court's good faith with

the allegations in its opening brief. *See* ECF 23 at 32-33 (claiming the court treated the crime as "a net positive" for Ms. Roske and "carried this theme" through sentencing); ECF 23 at 32 (stating the court "consigned" the harm to the Kavanaugh family "to a brief reference").

Whatever the government's motivation for requesting reassignment may be, it has utterly failed to offer any factual or legal justification for that extraordinary remedy in this case.

**CONCLUSION**

For the foregoing reasons, Ms. Roske respectfully requests that this Court affirm the district court's judgment.

Respectfully submitted this 14th day of October, 2026.

JAMES WYDA
Federal Public Defender for the
District of Maryland

*/s/ Sapna Mirchandani*
SAPNA MIRCHANDANI
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 344-0600
sapna_mirchandani@fd.org

*Counsel for Appellee*

**CERTIFICATE OF COMPLIANCE**

1. This Appellee's Response Brief has been prepared using WordPerfect X4 software, Century Schoolbook font, 14 point proportional type size.

2. Exclusive of the table of contents, table of authorities, statement with respect to oral argument, and certificate of service, this brief contains 12,982 words.

I understand that a material misrepresentation can result in this Court's striking the brief and imposing sanctions. If the Court so requests, I will provide a copy of the word or line print-out.

10/14/2026 — Date

*/s/ Sapna Mirchandani*
Sapna Mirchandani

# CERTIFICATE OF SERVICE

This is to certify that the foregoing Appellee's Response Brief was filed electronically via CM/ECF, which automatically sends notice of such filing to all registered counsel of record, and that a copy of the brief was sent via email to:

David C. Bornstein
Assistant U.S. Attorney
U.S. Attorney's Office
36 South Charles Street, Fourth Floor
Baltimore, MD 21201

William A. Glaser
U.S. Department of Justice, Criminal Division
950 Pennsylvania Avenue NW, Suite 1264
Washington, D.C. 20530

on this 14th day of October, 2026.

*/s/ Sapna Mirchandani*